UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-30054-MAP

| | |
|---|---|
| DEBORAH ST. PETER and | ) |
| MATTHEW BOGACZ, | ) |
|      Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF AGAWAM, TOWN OF AGAWAM | ) |
| POLICE DEPT., AGAWAM POLICE CHIEF | ) |
| ROBERT CAMPBELL, ANTHONY GRASSO, | ) |
| JAMES WHEELER, RICHARD NILES, | ) |
| KEITH BOPKO, JOHN MOCCIO, | ) |
| OFFICER MCGOVERN, | ) |
|      Defendants | ) |

## PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE REPORT AND TESTIMONY OF THE DEFENDANTS' EXPERT

Now come the Plaintiffs in the above-entitled matter and respectfully request that this

Honorable Court exclude the report and any testimony of the Defendants' expert witness, Mr.

Thomas F. Fitzgerald. As grounds therefore, the Plaintiffs state that the introduction of any of

Defendants' experts' evidence is highly prejudicial to the Plaintiffs as Mr. Fitzgerald made

numerous credibility determinations in arriving at his opinion in this case and thereby invaded

the province of the fact finder.

"It is the function of the jury alone to evaluate the credibility of a witness." Hoult v.

Hoult, 57 F.3d 1, 7 (1st Cir. 1995). "When an expert witness testifies with respect to the

credibility of a victim/witness there is a real danger that jurors will lend too much credence to the

expert's evaluation of the victim's credibility, at the expense of their own independent judgment

of credibility." Id. See United States v. Rosales, 19 F.3d 763, 766 (1st Cir. 1994)("proferred

expert testimony could create a substantial danger of undue prejudice...because of its aura of

special reliability and trustworthiness.")(quoting United States v. Fosher, 590 F.2d 381, 383 (1st

Cir. 1979). *See also,* Nichols v. American National Ins. Co., 154 F.3d. 875, 884 (8th Cir. 1998)("An expert witness cannot offer his evaluation of the truth. To do so is to question credibility, a right only reserved for the trier of fact.").

Mr. Fitzgerald's entire expert report/opinion is tainted by his belief that it is the Defendants' version of events that is, in his opinion, true. (See Expert Report of Thomas F. Fitzgerald, attached hereto as Exhibit "A"). Even his "Incident Summary" was written taking the Defendants' facts as being true. On page 4 of his report, Mr. Fitzgerald states, "I have attempted to give each version the weight it deserves based upon the presence of supporting facts and information. Using this methodology I have the following opinions." When asked to more fully explain these statements at his deposition, the following exchange took place:

Q:    Can you explain in a little more detail how it is you went about arriving at your opinions?

A:    Sure. I would look at what the officers claimed happened and what the plaintiffs claimed happened. As well as any additional information that was available. I would not look at just one version. I felt it would be important to consider all versions and then compare it with any physical evidence that would be available to look at. So that is what I was discussing in that particular sentence.

Q:    Did you look at any physical evidence?

A:    In other words, look at reports of things. I didn't see any physical evidence per se but—

Q:    Okay. So in looking at all of these documents, you looked at them and compared them all and made a credibility determination?

A:    I did make some credibility determination, yes. In other words, which would be more plausible, which would be more believable, which version of events.

(See Deposition of Thomas F. Fitzgerald attached hereto as Exhibit B, p. 15, lns. 23-24; p. 16, lns. 1-19).

As Mr. Fitzgerald testified, his entire methodology in arriving at his opinion was based on his credibility determinations; i.e. who *he* believed was telling the truth. When further questioned at deposition regarding his report, Mr. Fitzgerald testified as follows:

Q:    Under number 1, the first sentence after the comma, "Mr. Bogacz's refusal to produce his driver's license and submit to the arrest escalated the episode, resulting in the use of force." How did you make that determination?

A:    I made that determination based on the fact that *it seems implausible*, given the version provided by Mr. Bogacz and Officer Grasso, of how it initially started with Mr. Grasso—Officer Grasso put one handcuff on him and all of a sudden then to start using the OC spray. Given the context of the circumstances, it just seemed—it was not a believable story.

(Exhibit B, p. 17, lns 2-22).

When asked how he determined that Mr. Bogacz had failed to produce his license, when Mr. Bogacz has denied that he failed to do so, Mr. Fitzgerald was asked:

Q:    You did not find that version credible?

A:    I find the officer's version a little more credible.

(Exhibit B, p. 18, lns. 22-24; p. 19, ln. 1).

With regard to the testimony of the Plaintiffs' eye witness, Mr. Fitzgerald stated:

Q:    Did you not find her testimony credible?

A:    I found her testimony credible, but insufficient. She did not seem to see that much.

Numerous other references to credibility and the fact that Mr. Fitzgerald's opinion was based upon his credibility determination appear throughout both his report and his deposition

3

testimony.  The fact that he admits that his entire methodology and opinion was based on his

credibility determinations is highly prejudicial to the Plaintiffs and could unduly influence a jury.

Mr. Fitzgerald even admits that if *he* had found the Plaintiffs 100% credible, *he* would have

found that the officers involved used excessive force.  (Exhibit B, p. 31, lns 17-24; p. 32. lns. 1-

7).  In other words, since he did not believe them, that was not his finding.  Only a jury can make

this determination.  Hoult v. Hoult, 57 F.3d 1, 7 (1st Cir. 1995).

Lastly, Mr. Fitzgerald's report fails to comply with Fed. R. Civ. Pro. 26(a)(2) in that Mr.

Fitzgerald failed to disclose, and indeed did not know he had to disclose in his report the

compensation he was to be paid for his report and testimony.

WHEREFORE, for the foregoing reasons, the Plaintiffs respectfully request that this

Honorable Court exclude the report and any testimony of the Defendants' expert witness, Mr.

Thomas F. Fitzgerald.

Dated: August 24, 2006                THE PLAINTIFFS
                                      DEBORAH ST. PETER &
                                      MATTHEW BOGACZ


                          By:    _____
                                 Dawn D. McDonald, Esq., BBO # 647256
                                 Cooley, Shrair, P.C.
                                 1380 Main Street
                                 Springfield, MA 01103
                                 (413) 781-0750
96337                            (413) 733-3042 (facsimile)

## CERTIFICATE OF SERVICE

I, Dawn D. McDonald, Esq., hereby certify that on this 24th of August, 2006, I caused the
foregoing document to be served upon all the Defendants the above Motion in Limine, via E-
mail, as follows: Jeffrey L. McCormick, Esq., Robinson Donovan, 1500 Main Street, Suite 1600,
P. O. Box 15609, Springfield, MA 01103; jmccormick@robinson-donovan.com.


                                 _____
                                 Dawn D. McDonald, Esq.

4



1000 State Street
Springfield, Massachusetts
01109

June 9, 2006

Jeffrey L McCormick
Attorney at Law
Robinson Donovan, P.C.
1500 Main Street   Suite 1600
Springfield, MA   01115-5609

**RE. : Deborah St. Peter and Matthew Bogacz   v. Town of Agawam, et. al.**
**Civil Action   NO.: 04- - 30054  - MAP**

Dear Attorney McCormick:

   At your request, I have read and analyzed the following documents relative to the above
referenced matter :

- copy of the PLAINTIFFS' AMENDED COMPLAINT AND DEMAND FOR JURY
  TRIAL;
- copy of Plaintiffs Matthew Bogacz and Deborah St. Peter's Answers to Interrogatories
  Propounded on Behalf of (All) Defendants;
- copies of Plaintiffs' Answers to Interrogatories Propounded by Defendants ;
- copy of Plaintiffs Supplemental Answers to Defendants' First Set of Interrogatories;
- copy of Preliminary Report of Mr. Lou Reiter;
- copy of Plaintiffs' Automatic Disclosures;
- copy of Defendants' Automatic Disclosure ( including documents);
- copy of Agawam Police Department Dispatch Logs for 3-23-02 & 3-24-02
- undated photographs of Mr. Bogacz & Ms. St. Peter ;
- the following depositions
- Matthew Bogacz (and exhibits)
  Deborah St.Peter
  Phyllis Delucchi
  Anthony Grasso
  James Wheeler
  Brian Strong
  Keith Bopko
  Edward McGovern
  Steven Grasso
  Robert Burke

Theresa Moccio
Roland Dymon
Jennifer Blanchette
Richard Niles
Robert Campbell
Paul Chenevert

- copies of Agawam Police Department personnel records of various officers ;
- copies of Employer's First Report of Injury prepared by Officers Anthony Grasso and James Wheeler;
- copies of selected portions of the Agawam Police Department Policies and Procedures.

## INCIDENT SUMMARY

Shortly after midnight on 3-24-02 Mr. Matthew Bogacz was operating a motor vehicle owned by Ms. Deborah St. Peter in a westerly direction on Springfield Street in Agawam, Massachusetts. Ms. St. Peter was a passenger in the vehicle. Officer Anthony Grasso, an on-duty member of the Agawam Police Department assigned to traffic duty, was operating his police vehicle in an easterly direction in the area of the '300 block'. The location is posted for a maximum speed of 40 m.p.h. in the westerly direction. Officer Grasso, believing the speed of the vehicle exceeded the posted limit, utilized the on-board mobile radar unit to register the speed at 60 m.p.h. He also noted that the vehicle was 'straddling' the center line of the street. Officer Grasso reversed direction and proceeded westerly on Springfield Street and observed the vehicle make a left turn into the Sheri Lane Condominium complex. Upon his arrival in the parking area of the complex, Officer Grasso observed Mr. Bogacz walking away from the vehicle in the direction of the housing units. Officer Grasso states he addressed Mr. Bogacz and requested that he produce his driver's license. Officer Grasso states he asked for the document repeatedly as Mr. Bogacz continued to walk away from him saying 'what the ---- for'. Mr. Bogacz states that he was only asked twice and on both occasions did respond 'what for'?. Officer Grasso states that after the fifth refusal to produce the license, he made the determination to arrest Mr. Bogacz and asked him to place his hands behind his back (in order to place handcuffs on him). During this time, Officer Grasso states, Mr. Bogacz was becoming very agitated and did not comply with his request to submit to being handcuffed. At this point Officer Grasso states, he took Mr. Bogacz by the arm and was able to place one cuff on the right wrist of Mr. Bogacz. According to Officer Grasso, Mr. Bogacz would not allow the placing of the second cuff on his left wrist and 'tightened up his body and tried to pull away'. Mr. Bogacz states that after twice asking 'what for', he started to approach Officer Grasso and was reaching for his wallet to retrieve his license and Officer Grasso 'slapped a pair of handcuffs on me and slammed me on the hood and said 'you are under arrest'. Shortly after this exchange, Officer Grasso sprayed Mr. Bogacz with OC as he was unable to control him. Both men then fell to the ground with Officer Grasso on top and the incident continued. Mr. Bogacz states that while he was on the ground Officer Grasso struck him (Bogacz) at least three (3) times on the right cheek with his

2

(Grasso) right hand. Mr. Bogacz states that between the time he and Officer Grasso fell to the ground and the second handcuff was placed on him, he was sprayed again, beaten about the head more than six (6) times with a solid object (felt like a flashlight), and kicked in the chest approximately five (5) times ( by unknown officers). Officer Grasso relates that after falling to the ground, Mr. Bogacz put him in a headlock and rolled him to the ground where they continued to exchange blows until the arrival of Officer James Wheeler. At some point during this episode Ms. St. Peter exited the vehicle and states she saw Officer Grasso 'put handcuffs on Mr.Bogacz's hand, twist him around, put him down on the hood of the car and say you are under arrest'. She further states she saw Officer Grasso use his radio, spray Mr. Bogacz and both of the men fall to the ground with Officer Grasso on top'.

At some point Officer James Wheeler arrived and saw Mr. Bogacz sitting on top of Officer Grasso, striking him in the head and chest. Officer Wheeler states that he tried to pull Mr. Bogacz off Officer Grasso but was only able to roll the two of them over by grabbing Mr. Bogacz's shoulder. According to Officer Wheeler, Mr. Bogacz continued to punch Officer Grasso so he (Wheeler) sprayed Mr. Bogacz with OC. Officer Wheeler states that upon his arrival, Officer Grasso was 'fighting for his life'. After the spraying, Officer Wheeler states, Mr. Bogacz got up and started charging (at) him (Wheeler), swinging at him with both fists (with the handcuff swinging from one wrist). At this time, Officer Wheeler states, he again sprayed Mr. Bogacz but he (Bogacz) continued coming, forcing him (Wheeler) to grab his shoulders and attempt to apply a knee-strike to his chest. Officer Wheeler states that after employing a few knee-strikes he then employed an arm-bar takedown and he and Mr. Bogacz went to the ground. It was at that time, Officer Wheeler states, he was finally able to complete that handcuffing of the second hand.

As Officer Wheeler was completing the handcuffing process, Officers Grasso and Wheeler state, Ms. St. Peter approached Officer Grasso and started to hit/punch him. Officer Grasso states he 'took her to the ground and laid on top of her and pulled out a second pair of handcuffs' At this time, Officer Brian Strong arrived. Officer Strong states that upon his arrival he saw Officer Wheeler attempting to handcuff Mr. Bogacz and Officer Grasso lying on top of Ms. St. Peter, attempting to handcuff her. Officer Strong states he assisted in the handcuffing of Ms. St.Peter. Officer Robert Burke states that he arrived on the scene and saw Ms. St Peter 'struggling' and 'pulling away' from Officer Strong and that he (Burke) assisted Officer Strong in handcuffing her. Ms. St. Peter states that after exiting the vehicle, a police car with two (2) officers in it arrived and she was grabbed by the arm, thrown against a fence and to the ground, and then handcuffed and placed in a police car. (She now believes the two officers to be Officers Wheeler and McGovern).

Sergeant Steven Grasso arrived on the scene in the same vehicle as Officer Robert Burke and states he initially saw Ms. St. Peter struggling on the ground with Officer Strong, Officer Grasso lying on the ground, and Officer Wheeler with Mr. Bogacz, who was on his stomach on the ground. Sergeant Grasso asserts he went to Officer Wheeler's location (with Mr.Bogacz) and told Officer Burke to help Officer Strong (with Ms.St.Peter). The sergeant states he and Officer Wheeler picked up Mr. Bogacz and placed him in a cruiser. Mr. Bogacz states it was Officer Bopko that placed him in the cruiser and after doing so struck him two (2) times in the right cheek. Former Officer Bopko states he 'absolutely did not kick, punch, or hit anyone with a flashlight'. Sergeant Grasso

states that he subsequently had the plaintiffs removed from police cruisers and placed in the van for transportation to the police station. The plaintiffs were transferred but it is unclear which officers transferred which plaintiff. Mr. Bogacz states that three (3) officers carried him in a prone position to the van and on two occasions opened the door so as to strike his head. Officer Burke relates that he and Former Officer Bopko 'walked him to the van'. Ms. St. Peter states she was in the van when the doors opened and they 'threw Matt (Mr. Bogacz) in'. (Ms. St. Peter does not indicate that Mr.Bogacz's head was hit by the door). Upon their arrival at the police station, the plaintiffs state they were met by Sergeant (Richard) Niles, who informed them that non-compliance with directions would result in the breaking of their necks and burial in back of the police station. Sergeant Niles denies making such a statement.

## CRIMINAL COURT DISPOSITION

The criminal charges against the plaintiffs were considered in November of 2002 and a plea bargain was reached. The criminal charges were not pursued and in exchange Mr. Bogacz and Ms. St. Peter were assessed court costs in the amount of $450.00 each, restitution of $153.00 each for Officer Grasso's (injury) lost time from work and both were placed on supervised probation for two (2) years. Mr. Bogacz states that they admitted no guilt and referred to the Alford plea, which he understood as not admitting guilt but acknowledging the facts could possibly result in conviction.

## CONCLUSIONS / OPINIONS

In order to accurately assess the propriety of the defendant police officers actions in the matter under review, it is necessary to examine all of the available information and not simply accept the version(s) presented by either the plaintiffs or the defendant police officers. I have attempted to give each version the weight it deserves based upon the presence of supporting facts and information. Using this methodology I have the following opinions.

1. **The amount of force used on the plaintiffs was reasonable and necessary to effect their arrest, to prevent additional injury to the arresting officers, and was in measured response to the level of resistance offered by them.**

   Although the incident began with a (simple) motor vehicle violation, Mr. Bogacz's refusal to produce his driver's license and to submit to the arrest escalated the episode resulting in the use of force. The defendant officers articulated an understanding of the use of force continuum and placed Mr. Bogacz's level of resistance at a point requiring the force employed. The arresting officers' arrest narratives clearly indicate the use of force, including striking with hands and fists, spraying with OC, the application of knee-strikes and an arm-

bar takedown. The arresting officers arrest narratives and depositions are very consistent and give credibility to their version. Additionally, the medical evidence supports the position that the force the defendant officers claim was used was in fact the only force employed, resulting in the injuries sustained by the plaintiffs. (Of note is the fact that the arresting officers' injuries are also consistent with their description of the events).

2. **There is a procedure in place to document the use of force by field officers and thereby to provide reasonable oversight by supervisory personnel.**

The consensus of the involved officers clearly denotes an understanding that the arrest narrative must include any use of force that is employed during an arrest. Additionally, should OC spray be utilized, a separate injury report and a decontamination report is completed by a supervisor and directed to the Chief of Police. Additionally, given the number of police officers on the department (approximately 40), it is reasonable to assume that unreasonable use of force, and certainly the repeated use of such force, would readily be apparent to supervisory personnel.

3. **There is no evidence that a 'code of silence' was involved in the officers' accounts of the events.**

Plaintiffs' expert notes that the towing of the plaintiffs' vehicle is indicative of a Code of Silence' as police officers on the scene did not know who ordered the vehicle towed, that 'at best' it involved a traffic citation issue and there was no reasonable police necessity to tow the vehicle other than a form of harassment. The facts, however, demonstrate that Sergeant Steven Grasso ordered the car towed and stated that it is policy to search a car incident to an arrest. Likewise, Officer James Wheeler states that it is policy that vehicles are towed incident to arrest and prior to the vehicle leaving (the scene) an inventory search of its contents is conducted. The Plaintiffs' expert also cites the fact that following the incident two detectives responded to the scene in an attempt to locate witnesses and stated they did not locate any witness. He then states that Ms. Delucchi stated she was interviewed and 'told them everything she observed'. The detectives state that they did go to the scene but neither recall speaking to anyone who saw the incident/altercation. Given the deposition of Ms. Delucchi, it is a reasonable assumption that the detectives did not consider her observations significant enough to take a report. This may well be an arguable point but their actions are not indicative of a 'Code of Silence'.

The above observations and opinions are based on the facts, information and circumstances of which I am aware at this time. Should additional information become available, I would be happy to review it and reconsider, if appropriate, my findings.

If I may be of any additional assistance in this matter, please feel free to contact me.

5

Very truly yours,

Thomas F. Fitzgerald

CURRICULUM VITAE

THOMAS F. FITZGERALD
1000 STATE STREET
SPRINGFIELD, MASSACHUSETTS

June,2006

PERSONAL DATA

Date of birth: July 17,1944
Born in Springfield, Massachusetts

Military Status: Sergeant E-5
Massachusetts Air National Guard
June 1967 to June 1973.
Honorable Discharge.

EDUCATION

Federal Bureau of Investigation National Academy, Quantico, Virginia
Diploma awarded in June 1978.

University of New Haven, West Haven, Connecticut
M.S. in Criminal Justice. Degree awarded in Jauuary 1974.

Northeastern University, (University College), Boston, Massachusetts
B.S. in Law Enforcement. Degree awarded in June 1970.

American International College, Springfield, Massachusetts
M.A. in Education. Degree awarded in June 1967.

American International College, Springfield, Massachusetts
B.A. in Sociology. Degree awarded in June 1966.

EMPLOYMENT

American International College, Springfield, Massachusetts
        Associate Professor of Criminal Justice Studies
        September 2005 to present.
        Assistant Professor of Criminal Justice Studies
        January 1991 to September 2005.

    City of Springfield Police Department, Springfield, Massachusetts
        December 1966 to July 1990, retiring as Chief of Police.

| Assignments: | Police Academy | 12/05/66 to 01/01/67 |
| | Uniform Division | 01/02/67 to 03/30/69<br>12:00 midnight to 8:00 a.m. |
| | Detective Bureau | 03/31/69 to 03/29/70<br>12:00 midnight to 8:00 a.m. |

THOMAS F. FITZGERALD
Page 2

| | |
|---|---|
| Records Division | 03/30/70 to 06/26/72<br>12:00 midnight to 8:00 a.m.<br>06/27/72 to 09/18/72<br>8:00 a.m. to 4:00 p.m. |
| Promoted to Sergeant | August 2, 1972 |
| Planning and Research | 09/19/72 to 06/29/74 |
| Uniform Division | 06/30/74 to 04/05/75<br>4:00 p.m. to 12:00 midnight<br>Field Supervisor |
| Crime Prevention Bureau | 04/06/75 to 01/14/76<br>5:00 p.m. to 1:00 a.m.<br>Shift Supervisor |
| Academy | 01/15/76 to 05/22/76<br>Recruit Training Instructor |
| Leave of Absence | 05/23/76 to 11/05/76<br>United States Probation |
| Uniform Division | 11/06/76 to 12/21/76<br>8:00 a.m. to 4:00 p.m.<br>Field Supervisor |
| Promoted to Lieutenant | December 21,1976 |
| Uniform Division | 12/22/76 to 09/29/77<br>12:00 midnight to 8:00 a.m.<br><br>09/30/77 to 12/06/77<br>4:00 p.m. to 12:00 midnight<br>Operations Supervisor |
| Detective Bureau | 12/07/77 to 12/22/77<br>4:00 p.m. to 12:00 midnight<br>Officer in Charge<br><br>12/23/77 to 04/01/78<br>Liaison Officer to Hampden<br>County District Attorney's<br>Office |
| F.B.I. National Academy | 04/02/78 to 06/17/78 |

THOMAS F. FITZGERALD
Page 3

| | |
|---|---|
| Internal Investigating Unit | 06/18/78 to 01/12/80<br>Commanding Officer |
| Detective Bureau | 01/13/80 to 04/01/81<br>Liaison Officer to Hampden<br>County District Attorney's<br>Office |
| Promoted to Captain | April 1, 1981 |
| Crime Prevention Bureau | 04/02/81 to 07/27/83<br>Commanding Officer |
| Promoted to Deputy Chief | July 28, 1983 |
| Deputy Chief of Police | 07/29/83 to 12/07/88 |
| Promoted to Chief of Police | December 8,1988 |

Administrative Office of the United States Courts,
Division of Probation, U.S. District Court of Massachusetts
May 1976 to November 1976 as a Probation Officer.

ADJUNCT TEACHING POSITIONS

Holyoke Community College, Holyoke, Massachusetts
Law Enforcement Program, 1971 to present.

Springfield Technical Community College, Springfield, Massachusetts
Police Science Program, 1974 to present.

Commonwealth of Massachusetts, Massachusetts Criminal Justice Training
Council, Agawam Center, Agawam, Massachusetts
In-Service Training of Law Enforcement Supervisors, 1991 to present.

Westfield State College, Westfield, Massachusetts
Criminal Justice Program, January - June 1975, September - December 1980.

THOMAS F. FITZGERALD
Page 4

COURSES TAUGHT

    Community Policing
    Criminal Investigation
    Criminal Law
    Criminal Procedures
    Criminology
    Human Relations
    Internal Discipline
    Internal Investigations
    Introduction to Criminal Justice
    Juvenile Justice
    Law Enforcement
    Law Enforcement Management and Planning
    Police Operations
    Police Organization and Administration
    Productive Initiative in the Criminal Justice System
    Supervision of Criminal Justice Internships
    Supervisory Styles and Methods

PROFESSIONAL AFFILIATIONS

    Federal Bureau of Investigation National Academy Associates

    Massachusetts Chiefs of Police Association

    Massachusetts Police Association

    Western Massachusetts Chiefs of Police Association



**EXHIBIT**

B

ALL-STATE LEGAL SUPPLY CO.

---

```
0001
 1                                    Pages 1 -
 2                                    Exhibits - 1
 3
 4            UNITED STATES DISTRICT COURT
 5           WESTERN DISTRICT OF MASSACHUSETTS
 6                   No. 04-30054-MA
 7   DEBORAH ST. PETER and
 8   MATTHEW BOGACZ,
 9                       Plaintiffs
10   V.
11   TOWN OF AGAWAM, TOWN OF AGAWAM
12   POLICE CHIEF ROBERT CAMPBELL,
13   ANTHONY GRASSO, JAMES WHEELER,
14   RICHARD NILES, KEITH BOPKO,
15   JOHN MOCCIO, OFFICER MCGOVERN
16                       Defendants
17
18        DEPOSITION OF THOMAS F. FITZGERALD
19            TAKEN AUGUST 23, 2006
20            AT THE LAW OFFICES OF
21              COOLEY SHRAIR, P.C.
22               1380 MAIN STREET
23          SPRINGFIELD, MASSACHUSETTS
24   Reporter:  Raymond F. Catuogno, Jr.
25          REAL-TIME COURT REPORTING
26331 Main Street              807 Main Street
27pringfield, MA  01103     Worcester, MA  01610
2813.732.1157                    508.612.3432
```

```
0002
 1   APPEARANCES:
 2   For the Plaintiff:
 3   COOLEY SHRAIR, P.C.
 4   1380 Main Street
 5   Springfield, MA  01103
 6   BY:  DAWN D. McDONALD, ESQ.
 7   413.781.8750
 8   For the Defendant:
 9   ROBINSON DONOVAN, P.C.
10   1500 Main Street
11   Springfield, MA  01115
12   BY:  JEFFREY McCORMICK, ESQ.
13   413.732.2301
14          REAL-TIME COURT REPORTING
15331 Main Street              807 Main Street
16pringfield, MA  01103     Worcester, MA  01610
1713.732.1157                    508.612.3432
```

```
0003
 1   INDEX:
 2   WITNESS:  THOMAS F. FITZGERALD           PAGE
 3   Direct Examination by Ms. McDonald .......... 5
 4   EXHIBITS:
 5   Exhibit 1, Narrative for Patrolman
 6              James Wheeler ................. 20
 7          REAL-TIME COURT REPORTING
 8331 Main Street              807 Main Street
 9pringfield, MA  01103     Worcester, MA  01610
1013.732.1157                    508.612.3432
```

```
0004
 1            S T I P U L A T I O N S
 2        It is agreed by and between the parties
 3   that all objections, except objections as to the
 4   form of the questions, are reserved and may be
 5   raised at the time of trial for the first time.
 6        It is further agreed by and between the
 7   parties that all motions to strike unresponsive
 8   answers are reserved and may be raised at the
 9   time of trial for the first time.
10        It is further agreed by and between the
11   parties that the sealing of the original
12   deposition transcript is hereby waived.
13        It is further agreed by and between the
14   parties that the notification to all parties of
15   the receipt of the original deposition
16   transcript is hereby waived.
17          REAL-TIME COURT REPORTING
18331 Main Street              807 Main Street
19pringfield, MA  01103     Worcester, MA  01610
2013.732.1157                    508.612.3432
```

**Page 5**
(1) * * * * * *
(2) THOMAS F. FITZGERALD, Deponent, having
(3) produced satisfactory identification by means of
(4) Massachusetts Driver's License, was duly sworn,
(5) deposes and states as follows:
(6)
(7) DIRECT EXAMINATION BY MS. McDONALD:
(8) **Q.** Good afternoon, Mr. Fitzgerald.
(9) **A.** How are you?
(10) **Q.** I'm Dawn McDonald, attorney for the
(11) Plaintiffs in a case which you have been
(12) retained as an expert by the Defendants.
(13) Have you given -- I'm sure you have
(14) -- have you given a deposition before?
(15) **A.** Yes, I have.
(16) **Q.** So just make sure you answer
(17) verbally, and let me finish my question before
(18) you answer, and I will try to do the same, so
(19) the record is clear.
(20) If you don't understand a question,
(21) let me know and I will be happy to rephrase it
(22) for you.
(23) **A.** Fine.
(24) **Q.** Would you state your full name?

**Page 6**
(1) **A.** Thomas F. Fitzgerald.
(2) **Q.** Have you reviewed any documents,
(3) other than those listed in your report, prior to
(4) testifying here today?
(5) **A.** Yes.
(6) **Q.** Which ones?
(7) **A.** I subsequently reviewed an injury
(8) report submitted to the Chief of Police, and I
(9) also reviewed the Court documents relative to
(10) disposition of the criminal matters against
(11) Ms. St. Peter and Ms. Bogacz.
(12) MR. McCORMICK: I thought
(13) those had come over to you, and apparently
(14) they had not. So I made you copies. And
(15) here you go.
(16) MS. McDONALD: Thank you.
(17) **Q.** Did your review of these documents
(18) change in any way the report in which you have
(19) submitted?
(20) **A.** No.
(21) **Q.** Have they changed your opinion in
(22) any way with regard to your work on this case?
(23) **A.** No.
(24) **Q.** Do you know any of the defendants

**Page 7**
(1) outside of your work in this case?
(2) **A.** I know Chief Campbell. Not well,
(3) but I do know him.
(4) **Q.** He is an acquaintance?
(5) **A.** Correct.
(6) **Q.** He is not a friend?
(7) **A.** Correct.
(8) **Q.** Have you spoken with any of the
(9) defendants regarding this case?
(10) **A.** No.
(11) **Q.** And you have not spoken with the
(12) plaintiffs, correct?
(13) **A.** Correct.
(14) **Q.** And did you speak with Ms. Phyllis
(15) Delucci?
(16) **A.** No, I did not.
(17) **Q.** Have you been retained by anyone as
(18) an expert prior to your work on this case?
(19) **A.** Yes.
(20) **Q.** When was that?
(21) **A.** I have been retained on several
(22) cases.
(23) **Q.** About how many?
(24) **A.** Five, perhaps.

**Page 8**
(1) **Q.** Can you tell me when those cases
(2) were, approximately?
(3) **A.** All within the last five years.

**Page 9** — (right column)
(4) **Q.** Who retained you?
(5) **A.** Attorney Daniel Kelly. Attorney
(6) George Kelly. Attorneys from the law firm of
(7) Morrison. There were several attorneys there.
(8) **Q.** Morrison, Mahoney & Miller?
(9) **A.** Yes.
(10) **Q.** Do you recall which attorneys
(11) there?
(12) **A.** I do not recall, no.
(13) **Q.** Several attorneys on one case or
(14) several attorneys on different cases?
(15) **A.** On two different cases where I was
(16) retained by that firm.
(17) **Q.** Anybody else?
(18) **A.** No.
(19) **Q.** What type of cases were these?
(20) **A.** Cases brought against various
(21) police departments.
(22) **Q.** Which police departments?
(23) **A.** Two were at the other end of the
(24) state. I believe one was against the Town of

**Page 9**
(1) Wakefield. I don't recall the other one. The
(2) local case, I was retained by Attorney Kelly,
(3) was Town of Greenfield.
(4) **Q.** Do you recall who the Plaintiff was
(5) in that case?
(6) **A.** In the Greenfield case?
(7) **Q.** Yes.
(8) **A.** If you give me a minute I could
(9) think of it. Deborah -- the Defendants were the
(10) city, the police chief, his son. And the
(11) Plaintiff was Deborah -- I don't recall, but if
(12) I do, during the course of the deposition I will
(13) tell you.
(14) **Q.** Okay.
(15) **A.** Mathey (phonetic). I'm sorry,
(16) Deborah Mathey.
(17) **Q.** Were you retained by the defense in
(18) all of these cases?
(19) **A.** The case with Attorney Daniel
(20) Kelly, he was representing a plaintiff.
(21) **Q.** He was representing Deborah Mathey?
(22) **A.** No, different case.
(23) **Q.** I thought --
(24) MR. McCORMICK: Two different

**Page 10**
(1) Kellys.
(2) **A.** Two different Kellys.
(3) **Q.** George Kelly?
(4) **A.** George Kelly, no, it was --
(5) **Q.** Which one had the Greenfield case?
(6) **A.** Daniel. And it was subsequently
(7) handled by Attorney Pelletier.
(8) **Q.** And George Kelly retained you as
(9) Plaintiff's expert?
(10) **A.** No.
(11) **Q.** I'm sorry.
(12) **A.** That's all right.
(13) **Q.** Could you clear this up for me
(14) instead of me fumbling with the questions?
(15) **A.** Sure. The Plaintiff would have
(16) been Attorney Daniel Kelly from Springfield. He
(17) was representing the Plaintiff.
(18) **Q.** Okay. Did you testify at
(19) deposition or trial in Dan Kelly's case?
(20) **A.** Neither.
(21) **Q.** What did you do in your capacity as
(22) expert in that case?
(23) **A.** He asked me to review the police
(24) procedures employed during the investigation of

**Page 11**
(1) an accident.
(2) **Q.** Did you render an opinion?
(3) **A.** I wrote a report for him, yes, I
(4) did.
(5) **Q.** But no testimony was required?
(6) **A.** Correct.

(7) **Q.** And was that a case settled, do you
(8) know?
(9) **A.** I don't believe he ever brought
(10) suit.
(11) **Q.** And the case with George Kelly, did
(12) you testify in that one?
(13) **A.** No. That was settled before it
(14) went to trial.
(15) **Q.** What did you do for Attorney George
(16) Kelly?
(17) **A.** I reviewed the material and wrote a
(18) report and submitted my report, my findings.
(19) **Q.** And Morrison Mahoney, those two
(20) cases?
(21) **A.** They were both settled. But in
(22) both cases I reviewed the reports and documents
(23) and wrote reports in both cases.
(24) **Q.** You have not testified in any of

Page 12
(1) the cases you have been retained as expert in
(2) before today?
(3) **A.** Correct.
(4) **Q.** Were those cases in State or
(5) Federal Court?
(6) **A.** Federal.
(7) **Q.** All of them?
(8) **A.** I believe so.
(9) **Q.** What is the compensation you're
(10) being paid for your work on this case?
(11) **A.** The hourly rate?
(12) **Q.** However you're being paid.
(13) **A.** $150 an hour.
(14) **Q.** And is that for anything that you
(15) have to do on this matter?
(16) **A.** That is for the work on the matter.
(17) And then for depositions or trial it will be
(18) $1,000 a day.
(19) **Q.** Are you aware that is required to
(20) be in your expert report, a schedule of your
(21) fees?
(22) **A.** I submitted the information. I was
(23) not aware it was required, but I did submit that
(24) information and wrote a separate bill and sent

Page 13
(1) it to the attorney.
(2) **Q.** But it was not contained in your
(3) report, correct?
(4) **A.** Correct.
(5) **Q.** Do you have a copy of your report?
(6) **A.** I do.
(7) **Q.** If you don't, I have an extra.
(8) **A.** I do.
(9) **Q.** I'm going to be referring to it and
(10) I will be asking you some questions, and it may
(11) be easier if you have it in front of you.
(12) **A.** I do.
(13) **Q.** On the second page of your report,
(14) at the top, where it says -- after the list of
(15) names --
(16) **A.** Mm-hmm.
(17) **Q.** It says you reviewed copies of the
(18) Agawam Police Department personnel records of
(19) various officers.
(20) **A.** Correct.
(21) **Q.** Can you tell me what exactly you
(22) looked at in their personnel files?
(23) **A.** There were reports in there of
(24) officer conduct. It looked like department

Page 14
(1) reports.
(2) **Q.** Were those reports redacted?
(3) **A.** No, they are not.
(4) **Q.** If you know, were they internal
(5) Affairs reports?
(6) **A.** I don't know that.
(7) **Q.** That was for all the officers?
(8) **A.** No.
(9) **Q.** Do you recall which officers?

(10) **A.** No, I don't recall.
(11) **Q.** I understand that -- your attorney
(12) called me prior to your coming here today and
(13) said you had sent him -- I requested that you
(14) bring all the documents that you reviewed, and I
(15) guess you sent them to Attorney McCormick?
(16) **A.** Yes.
(17) **Q.** Were these documents included in
(18) the documents that you sent to Attorney
(19) McCormick?
(20) **A.** Yes.
(21) MS. McDONALD: Off the record.
(22) (Off-record conference)
(23) MS. McDONALD: Back on the
(24) record.

Page 15
(1) **Q.** You have here copies of selected
(2) portions of the Agawam Police Department
(3) Policies and Procedures. It's my understanding
(4) there are two versions, the version in effect at
(5) the time of this incident in 2002, and then an
(6) updated one. Did you look at both of them, one
(7) of them?
(8) **A.** I looked at what appears to be the
(9) first version, and the updated version, as well
(10) as some MPI suggested policies. And I was not
(11) completely clear as to which ones.
(12) **Q.** I'm not either, so --
(13) I'm looking at Page 4 of your
(14) report, under Conclusions and Opinions, and you
(15) state in the first paragraph, "I have attempted
(16) to give each version the weight it deserves
(17) based upon the presence of supporting facts and
(18) information. And using this methodology I have
(19) the following opinions."
(20) Can you explain in a little more
(21) detail how it is you went about arriving at your
(22) opinions in this report?
(23) **A.** Sure. I would look at what the
(24) officers claimed happened and what the

Page 16
(1) plaintiffs claimed happened. As well as any
(2) additional information that was available. I
(3) would not look at just one version. I felt it
(4) would be important to consider all versions and
(5) then compare it with any physical evidence that
(6) would be available to look at. So that is what
(7) I was discussing in that particular sentence.
(8) **Q.** Did you look at any physical
(9) evidence?
(10) **A.** In other words, look at reports of
(11) things. I didn't see any physical evidence per
(12) se but --
(13) **Q.** Okay. So in looking at all of
(14) these documents, you looked at them and compared
(15) them all and made a credibility determination?
(16) **A.** I did make some credibility
(17) determinations, yes. In other words, which
(18) would be more plausible, which would be more
(19) believable, which version of events. I noticed
(20) in the expert that you retained specifically
(21) looked at the Plaintiffs versions only. And I
(22) wanted to make it clear that I was not relying
(23) only on the Defendants versions. I wanted to
(24) look at what Ms. St. Peter had to say and Mr.

Page 17
(1) Bogacz had to say, as well as the officers.
(2) **Q.** Under Number 1, the first sentence
(3) after the coma, "Mr. Bogacz's refusal to produce
(4) his driver's license and submit to the arrest
(5) escalated the episode, resulting in the use of
(6) force."
(7) How did you make that
(8) determination?
(9) **A.** I made that determination based on
(10) the fact that it seems implausible, given the
(11) version provided by Mr. Bogacz and Officer
(12) Grasso, of how it initially started with

(13) Mr. Grasso -- Officer Grasso put one handcuff on
(14) him, and all of a sudden then to start using the
(15) OC spray. Given the context of the
(16) circumstances, it just seemed -- it was not a
(17) believable story. For no reason you would use
(18) OC at that particular stage of the game. You
(19) would complete the handcuffing process. And
(20) that was what I was getting at there. So
(21) something must have happened to cause the
(22) additional use of force here, in my opinion.
(23) **Q.** So I guess if you take one step
(24) backwards from that, you say that Mr. Bogacz

Page 18
(1) refused to produce his license?
(2) **A.** Correct.
(3) **Q.** You understand that he denies that?
(4) **A.** I understand from reading his
(5) deposition he kept saying "what for" before he
(6) produced it. Now the officer, of course,
(7) indicates something more than just a simple what
(8) for. We'll leave out the language there, but he
(9) was walking away, et cetera. But there is a
(10) clear difference there. But I think there is a
(11) mutual agreement that he did not say "yes, here
(12) it is" and immediately produce it.
(13) **Q.** Correct. But do you recall that
(14) Mr. Bogacz testified that he was reaching for
(15) his wallet to produce his license when a
(16) handcuff was slapped on him?
(17) **A.** In the deposition I believe he
(18) stated that after asking what the "F" for, he
(19) finally was reaching for the wallet. That is
(20) his version when the officer started putting the
(21) cuffs on him.
(22) **Q.** You did not find that version
(23) credible?
(24) **A.** I find the officer's version a

Page 19
(1) little more credible.
(2) **Q.** Okay.
(3) **A.** See, that's given the fact that
(4) when he stopped him, Mr. Bogacz was leaving the
(5) scene and didn't return until the officer was
(6) yelling at him to return. There is more to it
(7) than just the one-minute incident there.
(8) **Q.** Well, the officer made no attempt
(9) to pull Mr. Bogacz over while he was in the
(10) vehicle, correct?
(11) **A.** Well, the officer states that he
(12) made a U-turn and went back after him and then
(13) pulled into the parking lot. And officer's
(14) version was Mr. Bogacz hurriedly was running to
(15) Ms. St. Peter's apartment.
(16) **Q.** Further down you say "The arresting
(17) officer's arrest narratives clearly indicate the
(18) use of force including striking with hands and
(19) fists, spraying of OC, and the application of
(20) knee strikes, and arm bar take down."
(21) First of all, is a knee strike
(22) considered a use of force?
(23) **A.** Yes.
(24) **Q.** And as a form of use of force,

Page 20
(1) should that not be included in an arrest report
(2) or the officer's narrative?
(3) **A.** When you say should, I mean in an
(4) ideal world you would list every possible thing
(5) that happened. But when you're writing a report
(6) you can only summarize the most important
(7) events. If you had it to look at it
(8) retrospectively, yes, I would say yes, you would
(9) include it in there.
(10) **Q.** And are you aware that Officer
(11) Wheeler does not include the knee strike in his
(12) arrest report?
(13) **A.** I would really have to reread the
(14) arrest report, but I know that he clearly
(15) mentioned it in his deposition?

(16) MR. McCORMICK: Officer
(17) Willard?
(18) THE WITNESS: Wheeler.
(19) MS. McDONALD: Let's mark this
(20) as Exhibit 1.
(21) (Exhibit 1, Narrative for Patrolman James
(22) Wheeler, marked for identification)
(23) **Q.** Showing you Exhibit 1, which is
(24) Officer Wheeler's Narrative for the night of the

Page 21
(1) incident in question. You have seen that
(2) document before, correct?
(3) **A.** Yes, I have.
(4) **Q.** Can you take a minute and review
(5) that and let me know if you see anywhere that
(6) Officer Wheeler reported the use of knee
(7) strikes?
(8) **A.** No, I do not.
(9) **Q.** According to some of the officers
(10) whose depositions you reviewed, they state that
(11) their method of documenting use of force is to
(12) put the use of force in their narratives,
(13) correct?
(14) **A.** Mm-hmm.
(15) **Q.** So would you agree that if a form
(16) of use of force is not in the report, that would
(17) be a failing in some regard?
(18) MR. McCORMICK: Objection to
(19) the form.
(20) THE WITNESS: No, I would not.
(21) He clearly indicates there was a fight
(22) going on. He used the OC spray. So he
(23) clearly indicates, without using the term
(24) knee take down, that force was used. So I

Page 22
(1) would not be at all troubled that he
(2) specifically did not mention that. But I
(3) know that he did, in his deposition,
(4) clearly indicate how he used the knee take
(5) downs.
(6) **Q.** So an officer, any officer, is not
(7) required to specifically document the forms of
(8) the use of force that he employs?
(9) MR. McCORMICK: Objection to
(10) the form. Go ahead.
(11) **A.** Obviously, you would look at it to
(12) see exactly what force you used. I mean,
(13) clearly, you would, yes.
(14) **Q.** But if you don't -- how would you
(15) know what force they used if it's not in the
(16) report?
(17) **A.** Exactly. That is what I'm getting
(18) at. You would have to have it clearly
(19) indicated. But, I think, in the context here,
(20) he is indicating he used the OC, and grabbed him
(21) and struggled, indicating that he did use force.
(22) Although he did not, specifically, indicate the
(23) use of the take down.
(24) **Q.** Okay. You refer to, also, in your

Page 23
(1) report, under paragraph two, you say -- you're
(2) talking about the consensus of the officer's
(3) understanding that their arrest narrative has to
(4) include the use of force. And then it says,
(5) "Additionally" should OC spray be use utilized,
(6) a separate injury report and decontamination
(7) report is completed by a supervisor and directed
(8) to the Chief of Police"; do you see that?
(9) **A.** Yes, I do.
(10) **Q.** Where did you get that information?
(11) **A.** From the depositions. I believe it
(12) was Sergeant Grasso indicated in his deposition.
(13) **Q.** Have you seen an OC report in this
(14) case?
(15) **A.** No, I have not.
(16) **Q.** Do you know whether one was filled
(17) out?
(18) **A.** I do not know.

Page 24
(1) **A.** Correct. That is what the sergeant
(2) indicated in his deposition.
(3) **Q.** Okay. Do you recall if it's in the
(4) Agawam Police Department policies that you
(5) reviewed, whether a separate OC report should be
(6) filled out?
(7) **A.** I do not.
(8) **Q.** You mention in here the wall of
(9) silence, which of course the Plaintiff's expert
(10) propounded -- or propounded is the wrong word --
(11) expressed an opinion in our report. I
(12) understand that you disagree with that, with his
(13) opinion. In the first -- at the top of the page
(14) that has paragraph two on it, you say the
(15) arresting officer's arrest narratives and
(16) depositions are very consistent and give
(17) credibility to their version.
(18) Now, I understand that you do not
(19) believe that this occurred, but if there were a
(20) wall of silence, wouldn't all of their
(21) narratives and depositions be very consistent?
(22) **A.** No.
(23) MR. McCORMICK: Objection. Go
(24) ahead.

Page 25
(1) **A.** The WITNESS: No. There is no way,
(2) in my opinion, that so many officers and so many
(3) details could have scripted such a code of
(4) silence. I mean it was just -- when two
(5) officers said they did certain things, and the
(6) third officer said I came and I did this and
(7) subsequently did this, they all seemed to fit.
(8) There was no even simple errors of judgment
(9) recalling who assisted who at what point to
(10) arrest who or to move who or to transport who.
(11) The stories were very consistent. And I would
(12) look at something like that when you're talking
(13) about this code of silence. I don't think it
(14) could withstand the scrutiny of the depositions
(15) that you people put them through.
(16) **Q.** You didn't find any inconsistencies
(17) in their testimony?
(18) **A.** I found some omissions, what I
(19) would write off as honest I don't knows, I don't
(20) recalls, but I found no inconsistencies where
(21) one said I did this and the other one said no,
(22) he did not. And that is what I look for.
(23) **Q.** You then say that the medical
(24) evidence supports the position that the force

Page 26
(1) the defendant officers claimed was used was in
(2) fact the only force employed. How do you know
(3) that?
(4) **A.** I reviewed the medical reports for
(5) Mr. Bogacz and Ms. St. Peter. And given the
(6) version of the events offered by the officers,
(7) and somewhat Mr. Bogacz himself, those injuries
(8) were consistent with the explanation of what the
(9) officers claimed was the use of force involved.
(10) In other words, there was no hospitalization
(11) other than the emergency room treatment. There
(12) were no sutures, no substantial pain medication
(13) required. This looked like bumps, scrapes,
(14) bruises, and contusions that would be consistent
(15) with the type of confrontation that was
(16) expressed by the officers.
(17) **Q.** Do you have any medical background?
(18) **A.** No.
(19) **Q.** So you are basing that opinion on
(20) your experience as a police officer; is that
(21) correct?

Page 27
(1) about your opinion on the code of silence
(2) theory, and you say the facts demonstrate that
(3) the Sergeant Stephen Grasso ordered the car
(4) towed. What facts are those?
(5) **A.** The fact that he did order it.
(6) Your expert indicated that evidence of the code
(7) of silence was that nobody knew who ordered the
(8) car towed. Where clearly in his deposition, the
(9) Sergeant said I ordered it towed.
(10) **Q.** Referring to further down in the
(11) same paragraph, the detectives state that they
(12) went to the scene but neither recall speaking to
(13) anyone who saw the incident. And then you say,
(14) "Given the deposition of Ms. Delucci, it's a
(15) reasonable assumption that the detectives did
(16) not consider her observations significant enough
(17) to take a report."
(18) What do you mean by "given the
(19) deposition of Ms. Delucci"?
(20) **A.** By reading it. The facts that were
(21) covered in the deposition. In other words, what
(22) she stated in her deposition.
(23) **Q.** Did you not find her testimony
(24) credible?

Page 28
(1) **A.** I found her testimony credible but
(2) insufficient. She did not seem to see that
(3) much.
(4) **Q.** In your experience as a police
(5) officer, from what you read in her deposition,
(6) that is not anything that you would have
(7) recorded if you were conducting an
(8) investigation?
(9) **A.** I would have written a report, I
(10) think, indicating that I spoke to her and she
(11) was a witness, and probably would have put in
(12) what she said, although I don't think it would
(13) have been at all helpful in the prosecution of
(14) the case.
(15) **Q.** But you would have at least said
(16) that you didn't find much value to her -- what
(17) she had to say?
(18) **A.** Yes. I found her testimony credible.
(19) **Q.** Have you published anything in the
(20) last ten years?
(21) **A.** No.
(22) **Q.** I'm going to ask you a couple
(23) questions about your CV.
(24) Under your police department

Page 29
(1) experience you list some dates here and you have
(2) academy, recruit training instructor. Could you
(3) tell me what you did as a recruit trainer
(4) instructor?
(5) **A.** I actually ran the academy for that
(6) period of time. Conducting classes and
(7) arranging for instructors to come in and conduct
(8) the classes.
(9) **Q.** Where was the academy at that time?
(10) **A.** At the police station at 130 Pearl
(11) Street in Springfield. It was an in-house
(12) academy.
(13) **Q.** As opposed to --
(14) **A.** The regional academy now run by the
(15) state, now over at STCC, formerly over in
(16) Agawam.
(17) **Q.** Underneath that entry you have
(18) leave of absence, United States Probation. What
(19) does that mean?
(20) **A.** Correct. I took a leave of absence
(21) and I became a United States Probation Officer
(22) for a period of time.
(23) **Q.** What did you do in that capacity?
(24) **A.** I was a United States Probation

**Page 30**
(1) Officer.
(2) **Q.** I guess I don't understand what a
(3) United States Probation Officer does?
(4) **A.** Are you familiar with the probation
(5) officers in the state system?
(6) **Q.** Yes.
(7) **A.** They do the exact same thing for
(8) people that are violators and have been
(9) successfully prosecuted in Federal Court and are
(10) subject to Federal probation.
(11) **Q.** Why did do you that?
(12) **A.** Well, I'll tell you. If you want
(13) the honest truth, my wife was sick of me working
(14) nights and she saw this as a opportunity to put
(15) me on days with the weekends off. I tried it,
(16) and decided I liked police work, and went back
(17) to that.
(18) **Q.** You didn't try it for very long.
(19) **A.** I missed police work.
(20) **Q.** So did you actually have to quit
(21) the Springfield Police Department to take that
(22) job?
(23) **A.** They gave me a leave of absence.
(24) **Q.** For you to try it out?

**Page 31**
(1) **A.** Exactly.
(2) **Q.** That was nice.
(3) **A.** I thought so.
(4) **Q.** In-service training of law
(5) enforcement supervisors, 1991 to the present.
(6) That is at the academy?
(7) **A.** Correct.
(8) **Q.** You were training the supervisors?
(9) **A.** Correct.
(10) **Q.** And that is -- is that part-time?
(11) **A.** Yes. Certain courses they call
(12) you. The next one is scheduled in October, I
(13) will be teaching a new sergeant's class.
(14) **Q.** How long do they run for,
(15) generally?
(16) **A.** A couple days.
(17) **Q.** I will ask you a loaded question.
(18) If you believed the plaintiffs,
(19) would you believe that the officers had employed
(20) improper use of force in this case?
(21) MR. McCORMICK: Objection. Go
(22) ahead.
(23) **A.** If I believed 100 percent of what
(24) the plaintiffs said, yes.

**Page 32**
(1) **Q.** When you say 100 percent, can you
(2) explain why you said 100 percent?
(3) **A.** If I was totally satisfied that
(4) they were telling the absolute truth as it
(5) happened, then I would say the officers used
(6) excessive force. There would be no need for the
(7) arrest, no need for anything.
(8) **Q.** You were the Chief in Springfield
(9) for two years?
(10) **A.** About a year and a half.
(11) **Q.** While you were the Chief, were you
(12) ever sued in a case such as the one you have
(13) been employed in today?
(14) **A.** Yes.
(15) **Q.** And can you tell me about that?
(16) **A.** There were probably two or three
(17) where the department was named as defendant, as
(18) was I. And I don't recall even making it to the
(19) deposition stage. The suits come in, it would
(20) be referred to the law department, and I was
(21) never recalled to do any depositions after I
(22) left, so I don't know what happened in those
(23) cases.
(24) **Q.** Do you recall any of the facts of

**Page 33**
(1) any of those cases?

(2) **A.** No, I don't. I would routinely
(3) review reports of injuries to the Chief that
(4) were submitted, but very few went to the stage
(5) where we're now. Very few went to that stage.
(6) **Q.** Were you ever personally involved
(7) in any of those complaints, or did you get -- or
(8) were you named as a defendant because you were
(9) the Police Chief?
(10) **A.** The only time I was a defendant was
(11) in my capacity as Police Chief.
(12) **Q.** Have you ever had any use of force
(13) complaints filed against you at any time in your
(14) history as a police officer?
(15) **A.** Never.
(16) **Q.** Have you ever had any civil rights
(17) complaints or any other civil-type complaints
(18) filed against you in your capacity as a police
(19) officer?
(20) **A.** Never.
(21) MS. McDONALD: I'm done.
(22) MR. McCORMICK: No questions.
(23) Thank you.
(24) (Deposition concluded)

```
0034
 1  UNITED STATES DISTRICT COURT
 2  WESTERN DISTRICT OF MASSACHUSETTS
 3      I, RAYMOND F. CATUOGNO, JR., a Notary
 4  Public in and for the Commonwealth of
 5  Massachusetts, do hereby certify that there came
 6  before me on August 23, 2006, at the offices of
 7  Cooley Shrair, P.C., 1380 Main Street,
 8  Springfield, Massachusetts, the following named
 9  person, to wit:  THOMAS F. FITZGERALD, who was
10  by me duly sworn to testify to the truth and
11  nothing but the truth as to his knowledge
12  touching and concerning the matters in
13  controversy in this cause; that he was thereupon
14  examined upon his oath and said examination
15  reduced to writing by me; and that the statement
16  is a true record of the testimony given by the
17  witness, to the best of my knowledge and
18  ability.
19      I further certify that I am not a relative
20  or employee of counsel/attorney for any of the
21  parties, nor a relative or employee of such
22  parties, nor am I financially interested in the
23  outcome of the action.
24      WITNESS MY HAND August 23, 2006.
25
26                    Raymond F. Catuogno, Jr.
27                    Notary Public
28  My Commission expires:
29  March 1, 2007
30      REAL-TIME COURT REPORTING
31  331 Main Street        807 Main Street
32  Springfield, MA  01103  Worcester, MA  01610
33  413.732.1157            508.612.3432
```