UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DEBORAH ST. PETER and
MATTHEW BOGACZ,

     Plaintiff,

v.                                     C.A. No. 04-30054-MAP

TOWN OF AGAWAM, et al.,

     Defendants
_____/

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

## PRELIMINARY EXPERT REPORT OF LOU REITER

1.     My name is Lou Reiter.  I have been actively involved in police practices and law enforcement since 1961.  I was an active police officer for 20 years.  Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2.     Since 1983 I have been providing law enforcement consultation in police training and management.  I provide law enforcement training in the following areas:

- Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures

- Personnel practices.
- Supervisory techniques
- Crowd control procedures.
- Liability management.
- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization. My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3. Since 1983, I have been retained in over 950 police related cases. This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes case analysis and development and expert witness testimony. I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico, to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.

2

- Police policy and procedures development.
- Police training.

4.    I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the <u>Police Task Force Report</u> of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide <u>Law Enforcement Administrative Investigations</u>; the Second Edition in 1998.

5.    My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6.    I have reviewed the following materials to date regarding this case:

- Complaint
- Agawam Police Manual in effect as of March 24, 2002
- Agawam Police Manual being updated after
- Arrest, booking and supplemental reports regarding the arrests of the Plaintiffs
- Medical documents for Plaintiffs
- Interrogatories and responses by the Defendants
- Responses by Defendants to Request to Produce
- Injury reports for Officers Wheeler and Grasso

3

- Map of the Town
- Collective bargaining agreements between the Town and police employees 95-98, 98-01, and 01-04
- Vehicle registration information
- Five (5) citizen complaint and disciplinary documents for Officers Bopko, Grasso, Niles and Maccio
- Police training records
- Depositions with exhibits:
  - Sgt. Niles
  - Officer Wheeler
  - Officer Grasso
  - Ms. Phyllis Delucchi
  - Officer Burke
  - Sgt. S. Grasso
  - Officer Bopko
  - Officer Strong
  - Officer Blanchette
  - Officer McGovern
  - Plaintiff St. Peter
  - Plaintiff Bogacz
  - Officer Grasso
  - Chief of Police Campbell
  - Officer Dymon
  - Officer Maccio

7.     These opinions are based upon the totality of my specialized knowledge in the field of police practices.  This experience is derived from my personal police experience, knowledge and training.   This expertise has been developed during my 45 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant.  This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices.  The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies, my constant

4

training of police supervisors, managers and executives, my continuous interaction with other police professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards which modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal. Many of these generally accepted practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

5

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

8.      It is my understanding that the events leading to this litigation occurred on March 23, 2002. The Plaintiffs, Ms. St. Peter and Mr. Bogacz, were returning to Ms. St. Peter's apartment when Officer Grasso allegedly identified the vehicle, being driven by Mr. Bogacz, as speeding. Mr. Bogacz pulled into the apartment parking lot and got out of the vehicle. Officer Grasso pulled in behind the parked vehicle and requested Mr. Bogacz' license. Subsequently an altercation began between Officer Grasso and Mr. Bogacz. Additional Agawam Police units responded to Officer Grasso's call for assistance. Force was used on both Plaintiffs. Both Plaintiffs were arrested.

9.      This preliminary expert report will address two aspects of this matter and the police practices involved - (1) use of force and (2) agency issues.

### Use of force

**10.    The use of force used on both Plaintiff St. Peter and Bogacz by**

6

**members of the Agawam Police Department, in my opinion based upon my specialized knowledge, training and experience, was contrary to generally accepted police practices and unreasonable based upon the circumstances of the events related by the Plaintiffs and civilian witness Delucchi.**

11.     I am aware that there are distinctly divergent versions of the events of this incident involving the use of force, restraint and arrest of both Plaintiffs.  I am not making any credibility determinations and believe that it would not be appropriate for someone like myself to do so without first hand knowledge of the incident or personal contact with the parties.  My opinions are based upon the various versions being presented and then analyzed based upon my specialized knowledge, experience and training in police practices.

12.     Reasonable police officers are trained in the legal and operational aspects of use of force.  Use of force training all must conform to the Supreme Court decisions and state law.  This training has become national in scope.  Model policies on use of force are promulgated by several national guidance bodies such as the International Association of Chiefs of Police.  Police officers are provided with laws, models and subject control tactics to use.  These are designed to be within the parameters of legal uses of force.  They are also designed to protect not only the officer involved, but the subject upon whom force is used.  Officers are restricted in the use of force to use only that force which is reasonable and necessary to overcome resistance, comply cooperation and effect an arrest (*Graham v. Conner*).  The police training

stemming from this case and generally accepted by police practitioners is that the force used by officers must be evaluated on the seriousness of the crime, the level of resistence of the subject, the continuing threat to officers and others, and whether the subject is capable of resisting arrest and fleeing.

13.     This use of force training is usually complemented by the use of some form of use of force/control/subject resistance matrix, continuum or graphic. These are very similar in the basic content. They identify levels of subject resistance and types of officer reaction/response to this resistance. The graphics are designed to demonstrate visually to police officers, trainees and others viewing the document the reasonable relationship between what a subject being arrested/restrained does and the officer's response. Common to these graphics are subject levels of resistance such as verbal, passive, active, assaultive, aggressive and aggravated. Common descriptors used for officer response are presence, verbal, soft hand control, chemical agents, hard hand control, transporters, intermediate, incapacitating and deadly force.

14.     While the documentation from the Agawam Police Department did not specifically articulate these use of force elements, the depositions of the officers, Sgt. Grasso and Chief Campbell (40) do indicate that these police personnel are aware of these concepts. I am aware of various training programs authorized by the Massachusetts Criminal Justice Training Council and the model policies of the State for issues involving the reasonable use of force by police officers in Massachusetts. I am assuming that the officers involved in the use of force with the Plaintiffs were provided with this type of training either during their basic training or in-service training. The

written guidance for use of force by Agawam Police Department personnel provided during this litigation is very sparse and appears outdated, but those issues are more fully delineated in the second section of the report under "Agency Issues."

15.     Both Plaintiffs have testified that they were surprised when Officer Grasso pulled up behind their parked vehicle.  Mr. Bogacz had already gotten out of the car and was proceeding into the apartment complex.  Neither believed that their vehicle had been speeding.  Mr. Bogacz actually returned to the police car.  When he was asked for his license, he requested to know the reason for Officer Grasso's request.  Ms. St. Peter was still in the car at this time, but heard the exchange.

16.     Mr. Bogacz testified during his deposition that, while he was retrieving his wallet, Officer Grasso "slapped a pair of handcuffs on me and slammed me on the hood of the car." (30)   Mr. Bogacz denied that he actively resisted at any time nor that he used any profanity.  He was then sprayed with pepper spray (33) and they both tripped over a parking curb (35).  Mr. Bogacz testified that he ended up on his back with Officer Grasso straddling his chest and he was punched in the face "at least three" times (37-38).  He then saw Ms. St. Peter "get slammed into a fence" by another officer (44).  He was rolled over onto his stomach and was sprayed again with pepper spray by an unknown officer (53) and then was "beaten about the head and kicked" (54).  He felt it was with flashlights (54) "more than six" times (55).  Both of his hands were now handcuffed behind his back and he was sprayed again for the third time (59).  When he was placed in the police car, Officer Bopko, whom he identified and knew, struck him with a gloved fist "twice in the right cheek" (63-64).  Mr. Bogacz testified that the officers

placing him in the paddy wagon struck his head twice on the rear door (65).

17.    Ms. St. Peter testified in her deposition that she asked Officer Grasso what he was arresting Mr. Bogacz for when he "put him down on the hood of the car" (31).  She denied that she used any profanity.  Officer Grasso replied when she answered that she was not driving the car, "Then shut the fuck up and mind your own business" (32).  She acknowledged that she saw only one handcuff on Mr. Bogacz when he was sprayed with pepper spray and both he and Officer Grasso fell to the ground (35).  She saw Officer Grasso strike Mr. Bogacz twice with his fist as he was over him (39).  She testified that she felt someone grab her arm from behind (43) and "they threw (Officers Wheeler and McGovern) me up against the fence, and then threw me on the ground" (44).    One officer placed a knee in her back while another one held her legs as she was cuffed (45).  She observed "them hitting him (Bogacz) over the head...when he was lying down...saw one officer kicking him in the chest" (49) and she identified that officer as Bopko (50).  She testified that he kicked Bogacz three times (56).  She further testified that four officers struck Mr. Bogacz in the head with "something long and black" (58).

18.    Ms. Delucchi, a disinterested witness, testified that she was awakened by Ms. St. Peter's screaming (8).  She observed Mr. Bogacz on the ground face down with an officer on top of him (10) and Bogacz was "trying to protect his head area" (11) "because the officer's arms were moving, the shoulder, the head area, and it was like trying to protect it" (11).  The officer's "hands were very busy...just the hand moving...in the head area of Matt (Bogacz) and shoulders..." (12)   She observed the officer's

10

hands hitting the head (13). "The officer that came in the cruiser stood by the fence and, you know, surveyed the area. Then he looked up to where I was. I was kind of standing back looking out the window. And he went, witness, witness, with his head. And the next thing you know, the officer that was on Matt handed the officer that was standing up something, and — or that officer prior to that had said, we're going to cuff you, and they tried to get Matthew's hands but Matthew did everything they wanted him to do..." (15)   "He handed the officer that said, witness, witness something..." (16) that was larger than a hand (17). She observed Bogacz being placed into the police car and said he was not resisting (32-33). She testified that she was interviewed the next day by a detective (35), that there was a male and female detective (36), and she told them everything she observed (37). She said the area was "very well lit" with spotlights (47). "Matt was dong nothing but complying" and she did not hear him using any profanity (59).

19.     The medical documents and photographs disclose that Ms. St. Peter had injuries to her face and arms and Mr. Bogacz had injuries to his head, face and arms. Ms. Delucchi observed these injuries to both persons after the incident and their release.

20.     Accepting these versions of the confrontation would indicate that the force used by members of the Agawam Police Department were contrary to generally accepted police practices and unreasonable for the circumstances of the encounter. At the very best, the Plaintiffs engaged in verbal resistance. This would have warranted only the use of verbal commands and escort subject control techniques.

11

21.    Strikes to the head and face are not advocated either in police training or model policies.  This is an impact strike zone referred to as a "red zone" or an area likely to product serious injury and potential fatal consequences.  This area prohibition can be found in baton strike training and PPCT (Pressure Point Control Tactics) training.  This area is restricted by generally accepted police practices for only those instances when deadly force would be reasonable.  The encounter described by all persons, including the police officers, was not a deadly force encounter.  Even Officer Wheeler testified during his deposition, although he was referring to force being used by Mr. Bogacz against Officer Grasso, "When somebody is sitting on top of you, strikes you in the head area, that's serious bodily harm, could be imminent." (42)

22.    The uses of force, in my opinion, described by the Plaintiffs and Ms. Delucchi, supported by the medical documentation, would be unreasonable and contrary to generally accepted police practices.

23.    The officers have a totally different version of the events and deny using the types of force described by the Plaintiffs.

### Agency Issues

**24.    There are significant issues arising from this case which are indicative of a police agency not responding responsibility to the control of uses of force by its officers which are contrary to reasonable and generally accepted police practices.  These deficiencies are the types of inaction, omission or adverse action that can produce an environment within a police agency where a**

**field officer can feel comfortable using unreasonable force and feel that his/her actions will not be sanctioned.**

25.    Police use of force training has been described in the above paragraphs 12-14. Failure to implement an adequate use of force reporting system can cause this recommended training and written policy to be eroded. The supervisory practices and systems generally accepted in law enforcement are specifically important as their absence causes "operational implementation" and field performance much different than the principles espoused in training and policies/procedures. These latter supervisory deficiencies can only be evaluated by what is and is not done by field supervisors in relation to the actual field performance of officers.

26.    Reporting of uses of force by officers is well established in law enforcement. An old axiom is that "Good reporting reflects good police work." The force matrix described in the above paragraph 13 are models for officers to use in reporting the necessity to use force and the specifics of the tools and techniques used to control resisting subjects and effectuate arrests. Specific use of force reports have been advocated and used in law enforcement since the early and mid 1980's. They have been codified by the International Association of Chiefs of Police and the U.S. Department of Justice.[1] These supervisory practices have been effective in monitoring uses of force, identifying officers who may use force inappropriately, and focus on

---

[1] IACP National Law Enforcement Policy Center, "Reporting Use of Force," February, 1997, and the Best Practices Section of the Civil Rights Division, U.S. Department of Justice.

operational problems with written policy and/or training.

27.     The Manual used by the Agawam Police Department on the date of this incident was a very old version of the Massachusetts Police Institute model.  The date of that was 1977 and the Rules and Regulations was dated 1979.  In this latter document was the section regarding use of force.  There was no requirement for any reporting or supervisory oversight.  The manual at one point referred to the use of an "iron claw."  This was an antiquated come-along instrument that not many currently in law enforcement have ever seen other than in a police museum.  This document could hardly be considered relevant as it was authored years before the foundational opinion cases on the use of force by the Supreme Court - *Garner v. Tennessee 1985* and *Graham v. Conner 1989*.

28.     Whatever systems were in place for the Agawam Police Department in March, 2002, were in confusion as to officer understanding and implementation.  When use of force is reported, the specifics are placed in the arrest report.  This does not allow for a reasonable oversight by supervisory personnel as recommended by the above model policies and generally accepted police practices.  There is no reasonable method for the Agawam Police to identify the frequency of use, results of the use, medical consequences and the officers using force on a systematic basis.

29.     Chief Campbell testified that an officer using pepper spray is required to fill out a report regarding that use and the description is simply made part of the officer's narrative report (42).  Sgt. Grasso testified that went an officer uses OC (pepper spray) the "Patrol officer, whoever deploys the OC.  At that point, a report is generated, usually

by the officer, within an arrest report or incident report. So that covers the use-of-force report, the use-of-OC report. It there's an injury personally when OC spray is used, as a supervisor I do an injury report, just I do a spray with OC and I do a decontaminated per department policy, and that's directed to the chief." (29)    Sgt. Grasso further testified when asked whether there is no arrest what type of report would be used, "Well, I've yet to see an OC incident not end up in an arrest; but if it's used, yes, an incident report will be done." (32)    Officer Grasso testified during his deposition, "...the supervisor, the shift commander would, whenever there's any type of force that's used, he automatically comes to the scene. He's going to try to obtain witness statements to see if there is any witness to what took place. He's going to check not just the police officer, but he's going to check on the person taken into custody, and I believe in their capacity they probably fill out some type of form, I'm not sure. That's a different role than I have." (53-54)    Officer Grasso further stated regarding use of pepper spray or other use of force whether he's required to fill out a report, "I think that falls on the supervisors; they fill that out...If we use spray — I'm not quite sure how they do it. They might refer back to our — use the arrest report as also the report for use of force. I'm not quite sure on that. But I know that there is certain forms for use of force." (54-55) Officer Wheeler acknowledged that he used "knee strikes" and "pepper spray" on Mr. Bogacz. Officer Wheeler testified that "I'm not aware of a policy regarding pepper spray" and the any reporting "...would follow with the supervisors." (24) He further testified that the officer using the pepper spray is not required to fill out a report (24).

30.    In fact it was Officer Wheeler who completed the arrest reports on the

15

Plaintiffs. Those reports did not disclose his use of "knee strikes" which he equated to the use of a baton (23).

31.     The Code of Silence is a reluctance for persons to come forward with negative information about another person. This concept exists to varying degrees within all walks of life and employee settings. It is more sinister in law enforcement for several reasons. Police officers have powers over citizens which no one else in America has - to restrict liberty and to use force against a member of the public. Police officers are most often the only witnesses to police abuse of citizens' rights. The paramilitary nature of most police agencies creates a closer relationship amongst police officers.

The Code of Silence has been memorialized and documented in law enforcement historically. The 1931 Wickershim Commission study under President Hoover spoke to its existence in law enforcement. The writings of Neiderhoffer in the late 1950's and 1960's further documented this issue in law enforcement. It has been an integral part of all national study commissions on police practices and local commissions, such as the 1991 Christopher Commission in Los Angeles, 1992 St. Clair Commission in Boston, and 1992 Koltz Commission of the Los County Sheriff's Office. Its has been documented in the continuous commissions involving the New York Police Department since the days of Serpico and, most recently, the Mollen Commission. This concept and its negative effects have been documented in most leading and authoritative texts on police practices.

I have written about the Code of Silence and have made it an integral part of the regular training I conduct within law enforcement. I have testified on the Code of Silence in civil litigation trials at both the local and Federal levels.

32.     There are two distinct issues in this case which are indicative that the Code of Silence may be involved in the officers' accounts. There were at least seven (7) police personnel from the Agawam Police Department on the scene of these arrests. None of those persons knew who ordered the impound of Mr. Bogacz' vehicle or who did the impound. This was a private vehicle, involved at the best in a traffic citation issue, and was legally parked on private property. There would have been no reasonable police necessity to impound the vehicle other than a form of harassment for the persons being arrested.

33.     The day following this incident, the Police Department directed two detectives to go to the apartment complex and area of the arrest in an attempt to locate any witnesses. Detectives Dymon and Blanchette testified that they went to the location and conducted this canvass. Both testified that they did not locate any witness. They both also testified that they wrote no report and kept no notes of their activity. Yet, Ms. Delucchi testified that she was interviewed the next day by a detective (35), that there was a male and female detective (36), and she told them everything she observed (37).

34.     It is my understanding that additional materials may be in process of being produced or may be requested later. I would request that this report be considered a preliminary report. Should any subsequent information be produced and

17

materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

35.    At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

36.    My fees for this professional service is a flat Case Development Fee of $7500 and a fee of $2000 for a deposition in Rhode Island or $2500 per day plus expenses for services away from Rhode Island including depositions and trial appearances.


This report is signed under penalty of perjury on this 11th day of May, 2006, in Greenville, RI.


Lou Reiter

# LOU REITER...RESUME

**LOU REITER & ASSOCIATES**...58 smith avenue, greenville, rhode island 02828
401.949.6978...401.226.1380(cell)...LREITER583@AOL.COM

## POLICE CONSULTING EXPERIENCE

**Lou Reiter has been the principal consultant with Lou Reiter & Associates since its inception in 1983. In that capacity he has been providing professional consulting to law enforcement agencies in three primary areas: (1) training, (2) agency audits and (3) litigation services.**

### TRAINING

Lou Reiter typically conducts 15-20 training seminars and programs each year involving **approximately 1000 persons.** These presentations range in time from 3 hours to five (5) days with the majority being **a two (2) day seminar.** Normally attended by police supervisors, managers, command personnel and litigation/risk management elements, these seminars involve police practitioners from federal, state, county and municipal law enforcement agencies.

The most common areas of presentation and instruction are:

- Managing the Internal Affairs function, police discipline and the citizen complaint **process.**
- Investigation of critical incidents - officer involved shootings, **use of force, and pursuits/emergency responses.**
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit/emergency response issues.
- Investigative procedures and supervision.
- Personnel practices.
- Supervisory techniques.
- Liability management.
- Policy and procedure development.
- Jail intake procedures.
- Management **effectiveness.**

**These training programs have been presented in the following states for police training academies, private training groups, public agencies, governmental entities and academic facilities:**

| | | | |
|---|---|---|---|
| California | Ohio | Oregon | Alaska |
| Florida | Indiana | Washington | New Jersey |
| Georgia | Wisconsin | Hawaii | Connecticut |
| New York | United Kingdom | Vermont | District of Columbia |
| Texas | Minnesota | North Carolina | New Mexico |
| South Carolina | Missouri | Illinois | Michigan |
| Massachusetts | Arizona | Oklahoma | North Dakota |
| Rhode Island | Nevada | Louisiana | Arkansas |
| Pennsylvania | Utah | Mississippi | Kentucky |
| Virginia | Colorado | Tennessee | Kansas |
| Maryland | | | |

## LAW ENFORCEMENT AGENCY AUDITS

These types of agency audits take on many different forms. Some are designed to identify the strengths and weaknesses of the agency, make recommendations and present specific timetables for implementation. Others are specifically designed to evaluate the agency's liability potential, make recommendations and suggest implementation strategies. Some involve budgetary concerns and consideration of consolidation of police jurisdictions. Occasionally the purpose is to conduct an administrative investigation using external investigators due to sensitive or political potential conflicts of interest. Some are accreditation and re-accreditation on-site assessments for the Commission on Accreditation for Law Enforcement Agencies, Inc.

These audits are conducted either as a one-person unit or as a member of a larger team of police professionals, although not more than six (6) total. Most of these are through contracts with the affected governmental body. Some are through a litigation or risk management unit.

In 2001, Lou Reiter was appointed as the Federal Court Monitor for the consent decree in *Colin, et al., v. County of Ventura, et al.,* CV 97-8352, 98-3051 and 98-6092 LGB (Cwx), United States District Court, Central District of California.

Since 1996, Lou Reiter has acted as a consultant for the Special Litigation Section, Civil Rights Division, U.S. Department of Justice, in six (6) pattern and practices investigations concerning the cities of New York, New Orleans, Pittsburgh, Buffalo, Columbus, OH., and Charleston, WV. He has also worked with the cities of Cincinnati and Schenectady which were being investigated by this governmental agency.

Lou Reiter since 1983 has audited law enforcement agencies as small as three (3) persons to as large as 39,000 personnel. They have represented municipal, county and state entities. Normally, he conducts 3-5 of these audits each year. During these forms of audits, he rides with line officers and first level supervisors for nearly 100 or more hours for interviews and direct observation of field implementation.

The primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.

- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.
- Training and training documentation
- Use of police resources
- Support functions including communications, records and detention and holding facilities.

These types of agency audits have been conducted in the following states:

| | | | |
|---|---|---|---|
| Florida | Pennsylvania | California | Texas |
| Georgia | North Carolina | Illinois | New York |
| Arizona | South Carolina | Wisconsin | Rhode Island |
| Colorado | Virginia | West Virginia | Washington |
| Ohio | New Mexico | Louisiana | Montana |
| Delaware | Wyoming | Tennessee | |

## LITIGATION SERVICES

Lou Reiter, since 1983, has been involved in over 850 law enforcement civil litigation cases and a few criminal matters. He has acted both as a consultant and testimonial expert witness. These have been in Federal and local courts. He has worked with plaintiff attorneys approximately 60 percent of the time and the remainder with defense units. He has also been employed in this area by insurance entities, risk management pools, local prosecutorial offices and the United States Department of Justice.

While there has been a wide range of specific law enforcement practices and procedures which have been involved in those cases, some of the more common issues addressed in case development and subsequent testimony have been:

- Field procedures including tactics, arrest techniques and pursuits/emergency response driving.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures, including warrant applications, informant control and use, and search warrant processes.
- Jail intake procedures.
- Police management.
- Personnel practices, including hiring, retention, remediation, background investigations, use of professional counseling services and promotion/assignment.
- Investigation of citizen complaints.
- Employee discipline.
- Police policy and procedures development.
- Police training.

These litigation services have been in the following states and jurisdictions:

| | | | |
|---|---|---|---|
| Florida | Georgia | Alabama | Mississippi |

| | | | |
|---|---|---|---|
| Louisiana | Alaska | Ohio | Maine |
| California | Hawaii | South Carolina | New Hampshire |
| Texas | Montana | North Carolina | Puerto Rico |
| Missouri | Wyoming | Virginia | Rhode Island |
| Illinois | Colorado | District of Columbia | Washington |
| Indiana | Kansas | Maryland | Wisconsin |
| Michigan | Oklahoma | Pennsylvania | Massachusetts |
| Iowa | Texas | New York | Idaho |
| Oregon | Kentucky | New Jersey | West Virginia |
| New Mexico | Tennessee | Delaware | Nevada |
| Arizona | Minnesota | Connecticut | |

## PRIOR ACTIVE POLICE EXPERIENCE

Lou Reiter was a sworn member of the Los Angeles Police Department for 20 years between 1961-1981. He began as a police officer and retired as a Deputy Chief of Police. During that tenure he served in over 20 assignments. Some of those assignments included:

**Promotion schedule.**

- 1980    Deputy Chief of Police
- 1976    Commander
- 1974    Captain
- 1970    Lieutenant
- 1966    Sergeant
- 1961    Police Officer

**Personnel and Training Bureau, Commanding Officer.** As a Deputy Chief directed the operations of three (3) divisions and two (2) major sections, involving over 300 employees.

- Responsible for all training, personnel management, recruitment and selection, employee-management relations and behavioral science services
- Responsible for the successful implementation of the 1980 Consent Decree requiring increased hiring of females and minorities
- Chairman of the Use of Force Review Board which adjudicated all officer-involved firearm discharges, serious injuries resulting from police action and in-custody deaths
- Caused the initiation of a unique peer counseling program for employees and a transfer system for "burned out" employees from high activity areas and assignments.

**Operations West Bureau Commanding Officer.** Directed all police operations (patrol, traffic, investigations and vice/street narcotics) in the Western quadrant of the City with four (4) geographic stations and one (1) traffic division involving over 1400 employees.

**Planning and Fiscal Bureau Commanding Officer.** Directed the operations of five (5) divisions, involving over 400 employees.

- Responsible for the $310 million Police budget preparation and management
- Automated systems
- Planning and research
- Communications

- Guided the development of the Emergency Command Control Communications System, a multi-faceted computer based system financed by a $40 million tax override
- Provided on-going liaison with the City Council and directed efforts to develop local and state legislation

**Uniformed Coordinator for Operations Central and Valley Bureaus.** Each Bureau consisted of five (5) geographic stations, a traffic division, gang enforcement unit, and over 1600 employees. In addition to the overall coordination of patrol and uniformed operations, monitored and approved personnel complaint investigations, adjudications and discipline during this four (4) year assignment.

- Coordinated the successful police efforts in the San Fernando Valley during the 1978 school desegregation
- Directed the City-wide 500 person police reserve officer program
- Department liaison to community alcoholism programs
- Participant in the Physical Altercation and Tactics Committee
- Regular member of the Fleet Safety Review Board and Shooting Review Panel.

**Central Area Commanding Officer.** For two (2) years commanded over 250 uniformed officers and detectives in the Los Angeles Central City (downtown) area.

**Team policing.** Selected to make preliminary preparations and then command a unique team policing experiment in Foothill Division in July, 1973 (this was similar to the current Community Oriented Policing concept). This consisted of a command of 57 employees including detectives and traffic officers to maintain 24-hour police service for this area. Crime went down in this area while it rose in adjacent areas.

**Traffic assignments.** Served as a uniformed traffic accident investigator throughout the City. Investigated 1200-1500 traffic accidents and arrested nearly 400 drunk drivers. Provided specialized enforcement and accident investigation on the City's freeway systems in specially equipped pursuit vehicles.

**Patrol assignments.** Was a uniformed patrol officer in three (3) geographic stations. Functioned as a plainclothes member of an anti-crime unit. As a sergeant was a field supervisor and later, as a lieutenant, was a uniformed watch commander.

**Employee misconduct administration.** Investigated cases alleging employee misconduct both as a field supervisor and member of Internal Affairs Division. As the Department Advocate, presented the agency case against employees during internal administrative hearings (Boards of Rights). Later, as a Lieutenant, acted as a defense representative for accused employees during these same hearings. Adjudicated investigations of police misconduct and served as a member of Boards of Rights on many occasions.

**Other personnel related activities.** Participant in the Physical Altercation and Tactics Committee, Fleet Safety Review Board and Shooting Review Board. In 1981, chaired the Police Productivity Workshop which presented recommendations for massive changes in operations to respond to budgetary restrictions imposed by the passage of Proposition 13.

**Training commands and assignments.** Commanded (1980-1981) the Personnel and Training Bureau which included the Police Academy and video training production unit. Implemented programs (1980-81) to assist in the achievement of court consent decree hiring of females/minorities and their successful performance during the training aspect of their employment. Was the Assistant Commanding Officer of the Police Academy. Was the Officer-in-charge of the Human Relations Training Unit which covered such topics as community and cultural diversity, officer-partner relations, inter-personal communications, and handling the emotionally disturbed and mentally ill.

**Staff researcher and author for the 1973** *Police Task Force Report* **of the National Advisory Commission on Criminal Justice Standards and Goals.** The report assisted agencies nationwide to update their operations and develop plans for future growth and strategies. The three (3) specific chapters researched authored by Lou Reiter were "Internal Discipline, Training and Management-Employee Relations."

**Managing Unusual Occurrences.** Member of the Department Field Command Post Cadre since its inception following the 1965 Watts Riots. Developed procedures for police operations during such incidents principally as a member of the Operations Section and later incident command functions. Participated in numerous actual unusual occurrence control operations as well as training exercises responding to natural and man-made incidents.

**Volunteer police.** Managed the LAPD 500 person Reserve Officer Corps. Developed revised training programs and an in-service training element. Created a unique expert advisory group within this volunteer corps specializing on the expertise of lawyers, doctors, statisticians, educators and other specialists. Implemented a 54 person Reserve Chaplain program. Lobbied for and supported State laws mandating strengthened training and selection requirements for volunteer elements of police agencies.

**Community Relations and Crime Prevention.** Community Relations lieutenant and Assistant Commanding Officer of Hollywood Division, directing the community mobilization and crime prevention efforts. Was the Officer in Charge of the Public Service and Crime Prevention Section, Public Affairs Division.

**New Careers and Concentrated Employment Program.** In 1967, initiated, implemented and administered this U.S. Department of Labor funded program which employed, trained and assigned disadvantaged, underemployed persons to police community relations and crime prevention programs. Ninety (90) percent were ex-convicts or former narcotics users.

**Planning and Research.** Researched and authored policy and procedure changes for the Department and incorporated them into the Department Manual.

## ADDITIONAL INSTRUCTIONAL EXPERIENCE

During the years since 1971, Lou Reiter has been involved in continuous and varied aspects of training both within and outside the law enforcement field. Some of those not covered in the preceding sections are:

- Faculty member for national level police management and specialized programs for organizations such as the Public Agency Training Council (Indianapolis), Americans for Effective Law Enforcement (Chicago), Institute for Police Technology and Management (Jacksonville, FL.), Police Foundation Executive Institute, Commission on Accreditation for Law Enforcement Agencies, National League of Cities, Law Enforcement Assistance Administration, academic institutions, local police academies, state police organizations and risk management/insurance pool groups.
- Senior Consultant, Institute for Liability Management.
- Faculty member, Criminal Justice Management Program, Florida Center for Public Management, Florida State University.
- Certified Instructor, Law Enforcement Supervision/Management, Florida Department of Law Enforcement.
- Lifetime Vocational Training Certificate, Law Enforcement, California.
- Developed and presented "Frontline Supervision," a police supervision program.

Elected to the Santa Clarita Community College Board of Trustees in 1975 and reelected in 1979. Served as Board President and acted on many local and State committees on education.

Past member:

- Police Science Advisory Boards for Junior Colleges of Rio Hondo, El Segundo and Harbor City in the Los Angeles area.
- Faculty member for graduate and undergraduate level courses at various universities and colleges.
- Principal faculty member for the Management Development Program for the City of Los Angeles.
- Trainer for Florida American Cancer Society's Volunteer Leadership Development Program.
- California State University, Northridge, Advisory Committee on Teacher Education.
- Advisory Committee on Clinical Rehabilitative Services Credential, Department of Communicative Disorders.

## LAW ENFORCEMENT PROFESSIONAL ACTIVITIES

Since 1973, Lou Reiter has been involved in law enforcement professional activities and programs. Many of these were during his tenure with the LAPD. Other have been as a concerned public member and police consultant. Some of those include:

- Assessor, Commission on Accreditation for Law Enforcement Agencies, Inc., (1985- ), and has been assigned to both on-site audits for accreditation and re-accreditation. Re-certified as an assessor in 1999 at Montreal Conference and in 2002 at Cleveland.
- Advisory Board Member, Legal and Liability Risk Management Institute, Indianapolis, IN.
- American Society for Law Enforcement Trainers, member.
- National Internal Affairs Investigator's Association, member and conference presenter.
- National Center for Women and Policing, member.
- Founding Member, Tallahassee Committee of Ninety-Nine and former member of Board of Directors (1982-1988) and Secretary (1984-1987). This organization was formed in 1981 and provided support to local law enforcement agencies for greater professionalization, underwriting local police training programs, purchasing police equipment and ensuring benefits to families of police officers.
- Presenter and participant, 1982 and 1983 Florida Governor's Challenge Conference on Crime.
- Chair, Public Safety Committee, 21st Century Council, City of Tallahassee (1990-1993). This citizen group was organized to create an annual assessment guide to evaluate the effectiveness of our community's public safety performance.
- Past member, California Peace Officers Association
  - Chairman (1979-81) Standards and Ethics Committee.
    - Initiated and moderated the First Joint Symposium on Professional Issues.
    - Developed and received State approval and distribution of the *Code of Professional Conduct and Responsibilities for Peace Officers*.
  - Member, Law and Legislation Committee.
  - Member, Small Agency Committee.
  - Member, Reserve Officers Committee.
  - Recipient of the 1981 'Professionalism Award' from the California Peace Officers Association.

- Member or past member:
  - Florida Sheriffs' Association, Lifetime Member.
  - Florida Council on Crime and Delinquency.
  - American Society for Training and Development, local and National.
  - Public Safety Committee, League of California Cities.
  - Los Angeles County Peace Officers Association.
  - Southern California Police Community Relations Officers Association.

## PUBLICATIONS

Lou Reiter has published many law enforcement articles. With the exception of his Internal Affairs manual mentioned below, most of his current publications are integral parts of training he provides and are tailored to the specific subject matter and audience of the presentation. The below represent many of his published works:

- *Law Enforcement Administrative Investigations, a manual/guide.* This comprehensive 120 page manual was first published by Lou Reiter & Associates in 1993. The 2nd edition was published in 1998 and is an expanded version with several guest author chapters and contains over 300 pages in a 'nuts and bolts' method of presentation for practitioners.
- "Past time to reform police bill of rights," OpEd article, <u>Providence Journal</u>, July 25, 2005
- "Witnesses: A critical element in administrative investigations," Legal and Liability Risk Management Institute web site, 2005
- "The need for IA/OPS audit," Legal and Liability Risk Management Institute web site, 2004
- "Internal Affairs: The new Achilles tendon for police agencies," Legal and Liability Risk Management Institute web site, 2004
- "Consent Decrees: Why they're important for your agency," Legal and Liability Risk Management Institute web site, 2004
- "So you want to be an expert witness," Legal and Liability Risk Management Institute web site, 2003
- "Creating Reasonable and Defensible Discipline," Commission on Accreditation for Law Enforcement Agencies, Inc., <u>Newsletter</u>, November, 1996.
- "Timesharing With Your Subordinates," <u>Florida Police Chief</u>, April, 1984.
- "Police Agencies Need Shooting Policy," <u>Tallahassee Democrat</u>, September 27, 1982.
- "Truth About Miami Is Down in the Streets," <u>Tallahassee Democrat</u>, December 27, 1982.
- "Police Recruitment in the 80's - Crisis or Opportunity?" <u>Western City</u>, May, 1981.
- "Civil Detoxification in Los Angeles," <u>Police Chief</u>, August, 1981
- "Professional Police," <u>California Peace Officer</u>, 1980.
- "The Elected Public Official Views Police Professionalism," <u>California Peace Officer</u>, 1980.
- "A Footbeat Officer's View of Police Work," <u>Journal of California Law Enforcement</u>, October, 1979.
- "A Day With Sergeant Maynard Jones," <u>Police Chief</u>, April, 1979.
- "Field Sergeants' Administrative Time Utilization," <u>Journal of California Law Enforcement</u>, unknown date.
- "Make Your Meetings Successful," <u>Journal of California Law Enforcement</u>, April, 1979.
- "Ways To Get That Paper Out Now, Faster and Better," <u>Journal of California Law Enforcement</u>, October, 1978.
- "Internal Discipline," "Training," and "Management-Employee Relations," <u>Police Task Force Report</u>, National Advisory Commission on Criminal Justice Standards and Goals, United States Department of Justice, U.S. Printing Office, 1973.

## URBAN ECONOMIC DEVELOPMENT AND COMMUNITY ACTION GROUPS

During his residence in both Southern California and Florida, Lou Reiter has been active in various programs designed to improve and enhance community and economic development. Some of those activities have included:

- Tallahassee Area Chamber of Commerce and committees on County and City Governments.
- Local committee for district member voting in Leon County.
- Forward Tallahassee.
- Board of Directors, Skid Row Development Corporation. A non-profit organization formed to stimulate redevelopment of the skid row area in Los Angeles, attract funding sources, funnel monies to redevelopment projects and oversee the general plan for this designated area. During the first year originated over $6 million of projects impacting business stimulation and residential housing.
- Board of Governors, Alcohol Detoxification and Rehabilitation Center. In 1976 conducted an extensive management study of this program. The results were implemented and produced an increased intake of public inebriates and reduction in walkout rates.
- Central Business District Redevelopment Project, Skid Row Task Force.
- Greater Van Nuys Chamber of Commerce and member of the Business Improvement Committee and Vitalize Van Nuys, Inc. ( a specific economic action project).

## COMMUNITY ACTIVITIES

Community activities have been a personal commitment for Lou Reiter. Many of these were in connection with his duties as a police practitioner. Others were from his personal orientation to the communities in which he has lived. Some of those not previously mentioned have included:

- American Cancer Society
  - ‣ Board of Directors and Executive Board, Florida Division.
  - ‣ State Crusade Committee, Vice Chair.
  - ‣ Chairperson, State Direct Mail and Marketing Subcommittee.
  - ‣ President (1986-87) and Board of Directors, Leon County Unit.
  - ‣ Trainer, State Volunteer Leadership Development Program.
  - ‣ Crusade Chairperson (1982-84) Leon County Unit which increased donations 60% to a record high of $111,000 annually.
- President, Consolidation NOW, a citizens' group advocating the consolidation of governments of Leon County and the City of Tallahassee.
- President (1985) and member Board of Directors (1983-88), Tallahassee Junior Museum. During the year as President the museum received accreditation from the American Association of Museums.
- Chairperson, Airshow '86, Tallahassee's first major airshow. Co-chair, Airshow '87.
- Rotary International
  - ‣ Providence Rotary (2004- )
  - ‣ Smithfield, RI, Rotary (2002-2004 )
  - ‣ Tallahassee Capital Rotary (1981-1999 )
  - ‣ Paul Harris Fellow (1976)
  - ‣ Service Above Self/Member of the Year recipient (1986-7)

- ▸ Presenter at district and zone conferences
- ▸ Past member, Newhall, CA., Rotary
- ▸ Creator of the Newhall Rotary Community Service Fund
- ■ Memberships, current and previous:
  - ▸ Forward Tallahassee, Public Safety Committee
  - ▸ Florida Economics Club
  - ▸ Tallahassee Tiger Bay Club
  - ▸ WFSU-TV committees
  - ▸ Partners in Excellence, a school/business support program
  - ▸ 1987 Leon County School District "Citizens For Better Schools" Bond Steering Committee
  - ▸ Florida State University Artists Series, benefactor
  - ▸ Public Inebriate Task Force, Alcoholism Council of Greater Los Angeles
  - ▸ Canyon County, CA., Formation Committee
  - ▸ Vice President and Board of Directors, Santa Clarita Valley Boys and Girls Club
  - ▸ Board of Directors, Tallahassee Informed Parents
  - ▸ Boy Scout Troop 23 Committee
  - ▸ Swannee Area Scout Council Fund-raising Committee
  - ▸ Board of Directors, LeMoyne Art Foundation
  - ▸ Member and Director, United Way of Leon County

## FORMAL EDUCATION

University of Southern California - Graduate of the Managerial Policy Institute (1980) and graduate study in the Master of Public Administration program.

Pepperdine University - Bachelor of Science in Public Management/Criminal Justice Program .

University of California at Los Angeles - undergraduate study in Political Science.

## PERSONAL

Born March 31, 1939, in Minneapolis, Minnesota.

Resident of Rhode Island since 1999 and Tallahassee, Florida, between 1981-1999. Lou Reiter lived in the Los Angeles area for nearly 30 years.

Lou's wife is Marilyn McFadden who is an attorney and was a certified Florida police officer. She currently specializes as a consultant in law enforcement and prosecution issues of Domestic Violence and is considered one of the leading experts in police employee-related domestic misconduct. They have six (6) grown children one of whom was a police officer with the City of Tallahassee.

**LOU REITER TESTIMONY**

**January, 2002**

Jeff Grant (P), Seattle, *Cavanaugh v. City of Mt. Vernon,* C00-1973-L, T

**February, 2002**

Kari Mitchell (P), Detroit, *Robinson v. City of Southfield, MI.,* 00-016020 NO, T

**May, 2002**

Cari Shehorn (D), Phoenix, *George v. Maricopa County Sheriff's Department,*        D
Carl Lewis (P), San Diego, *Perez v. Escondido,*            D

**June, 2002**

Billy Martin (D), Washington, DC, *U.S. Department of Justice v. City of Cincinnati,* Federal Court Review,
    T

**July, 2002**

John Lovey/Russell Barnett (P), Chicago, *Robinson v. City of Harvey,* 99C3639, T

**August, 2002**

Tim Cavenaugh (P), Chicago, *Lyons v. Adams,*        D

**September, 2002**

Andy DeBevoise (D), Orlando, *Cleningden v. County of Brevard, FL.,*        D
Greg Samms (P), Miami, *Davis v. City of Ft. Pierce, FL.,* 00-14126 CIV-PAINE, T
Rebecca Laws (D), Ellicott City, MD., *Gruczynski v. Howard County, MD.,*WMN 02CV1137, D

**October, 2002**

Mark Forsberg (D), Carson City, NV, *Solis v. Holub,*       T
Tom Petersen (P), Medford, OR, *Jane Doe v. County of Siskiyou, CA,* S-01-2-80 MLS PAN, D

**November, 2002**

Gabrielle Valdez (P), Albuquerque, *Carabajal v. County of Bernalillo,* CIV 02-0284 JC/WWD, D

**December, 2002**

Susan Hable (D), Phoenix, *Blackmore v. Maricopa County Sheriff's Department,*        D
Barbara Fromm (D), Tallahassee, FL., *Hudson v. Escambia County Sheriff's Office,* 3:01 CV 416
    RV/SWN, D

**January, 2003**

Mark Jarmie/Jason Bowles (P), Albuquerque, *Tanberg v. Sholtis,*        D

1

**February, 2003**

Andy DeBevoise (D), Orlando, *Cleningden v. County of Brevard, FL.,*       T

**March, 2003**

Mary Han/Paul Kennedy (P), Albuquerque, *Louren Oliveros v. County of Bernalillo,* CIV-02-0732 RLP
    LFG, D
Joe Fine (P), Albuquerque, *L'Esperance v. John Mings,* CIV 02-0258 CJA/DJS, D
Timothy Touhy (P), *Russ v. City of Chicago,*                     , D

**April, 2003**

Elizabeth Hodgsen (P), Des Monies, IA., *Seibold v. Frisbie,*    , D
Timothy Wheeler (P), Santa Monica, *Reid v. City of Redlands, CA.,*      D

**May, 2003**

Judith Berkan/Peter Berkowitz (P), San Juan, Puerto Rico, *Gonzalez v. Cartenega,* Civil No. 00-2502(HL),
    D

**June, 2003**

William Hulsy (P), Santa Ana, *Bailey v. County of Riverside, CA.,* EDCV 01-403 VAP(SGLx), D/T
Gary White (P), Columbia, SC, *Huggins v. Lexington County Sheriff's,* 3:02-2361-17, D
Mark Jarmie/Jason Bowles (P), Albuquerque, *Tanberg v. Sholtis,*       T
Phil Hohenlohe (P), Helena, MT., *Olsen/Montana Advocacy Program v. City of Bozeman,* Human Rights
    Commission Hearing, T

**July, 2003**

Jerry Marconi (P), Chicago, *Saponaro v. City of Bellwood, IL.,* No.98 L 4985, D

**September, 2003**

David Golub (P), Stamford, CT., *Peters v. Greenwich, CT.,* CV 950147192 S, D
Rob Jarchi (P), Santa Monica, *Gousse v. Los Angeles Police Department,* BCS252804, D
David Cerda (P), Chicago, *Duran v. Cicero,* 01 C 6858, D

**October, 2003**

Tyler Weaver (P), Seattle, *Hickey v. City of Seattle,* C00-1672 R, D
Rob Jarchi (P), Santa Monica, *Gousse v. Los Angeles Police Department,* BCS252804, T

**December, 2003**

Judith Berkan/Peter Berkowitz (P), San Juan, Puerto Rico, *Gonzalez v. Cartenega,* Civil No. 00-2502(HL),
    T
David Switalski/Steven Andrews (P), Tallahassee, FL., *Rominger v. Florida Dept. of Law Enforcement,* T
Scott Carr (P), Santa Monica, CA., *Grill v. Los Angeles World Airport Police Department,* D
Michael Meehan (P), Tucson, AZ., *Wertheim v. City of Tucson/Pima County SO,*   D

2

**January, 2004**

Teresa Parrish (P), Albuquerque, NM., *Paloni v. City of Albuquerque*,    D
Steve Roach (P), Boston, *Ruggerio v. City of Boston*, 00-CV-1232ORCL, D

**March, 2004**

Thomas Marszsewski (P), Chicago, *Collins v. City of Chicago*,    D
David Golub (P), Stamford, CT., *Peters v. Greenwich, CT.,* CV 950147192 S, T

**April, 2004**

James Crabtree (P), Lenaxa, KS., *Klein v. State of Kansas*,    D
Michael Meehan (P), Tucson, AZ., *Wertheim v. City of Tucson/Pima County SO,*  T

**May, 2004**

Jon Meyer (P), Manchester, NH., *Recupero v. Town of Deering*,    D
Samuel Paz (P), Santa Monica, CA., *Martinez v. California Highway Patrol*, GIN025209, D
Beatrice Brickhouse (D), Albuquerque, NM., *Bain v. City of Albuquerque*, CIV-03-033CWPJKBM, T

**June, 2004**

Jaffe/Spinella (P), New Britain, CT., *Andrus/Celetano v. Grasso,* CV 96-0392407-S, T

**July, 2004**

Bill Kurnik/Vince Cipolla (D), Des Plaines, IL., *Adams v. Town of Steger, IL.,* 01-L-00477, D

**August, 2004**

Roman Okrei/Gordon Ring (P), Rockford IL., *DeLuna v. City of Rockford*,    D

**September, 2004**

Bruce Bogan (D), Orlando, FL., *Ingram v. Daytona Beach,* 2003-31253 CICI, D

**October, 2004**

Kathy Barnard (P), Seattle, WA., *SEIU/Marsh v. Redmond*, Arbitration hearing, T
Bradley Marshall (P), Seattle, WA., *Thomas v. Miller*, CV03-0796Z, D
Bradley Marshall (P), Seattle, WA., *Thames v. City of Pensacola, FL.,*    D

**November, 2004**

Jude Basile (P), San Luis Obsipo, CA., *Vestal v. County of San Luis Obsipo,* CV 04-0064 JFW (Shx), D

**December, 2004**

Michael Withey (P), Seattle, *Johnson v. City of Seattle*,    D

3

### January, 2005

Edward T. Moore (P), Dallas, TX., *Martinez v. City of Dallas*, 03-1054-C, D

### February, 2005

Ed Plato (D), Farmington Hills, MI., *Bobb v. City of Inkster,* 03-70223, D
Kevin Martinez (P), Albuquerque, NM., *DeYapp v. Tracy*, 02-0452 MV/RLP(ACE), D
Cameron Stewart (P), Los Angeles, *Torres v. City of Madera, CA.,* CV-F-02-6385 AWI-LJO, D
Paul Spinella (P), Hartford, CT., *Hogsfeld v. Town of Old Saybrook, CT.,* 3:01CV1979(WWE), D
Hebert Santos/Sandra Snaden (P), Hartford, CT., *Florence v. Town of Plainfield, CT.,*    D

### March, 2005

Truman Chafin (P), Williamson, WV., *Pruitt v. West Virginia State Police*, 03-C-137, D

### April, 2005

Tim Touhy (P), Chicago, *Zagar v. City of Chicago*, 01 L 5176, D
Mel Brooks (P), Chicago, *Goodall v. City of Dolton,*          D
David Cerda (P), Chicago, *Brown v. City of Chicago,*          D

### May, 2005

Andrew DeBoivse (D), Winter Park, FL., *Porter v. White*, 8:04-CV-367-R-17MSS, D
Keith Tischler/Gayle Swedmark (D), Tallahassee, FL., *Ault v. Putnam Co. S.O.*, 99-1095-CIV-J-219, T

### July, 2005

Stephanie Griffin (D), Albuquerque, *Best v. City of Albuquerque,* CIV 04-0357 BB/WDS, T

### October, 2005

Timothy Warner (D), Panama City, FL., *McCloud v. Anderson*, 04-80984, D
John Culver/Mark Silverstein, Denver (P), *Nash v. City/County of Denver,* 05 CV 4500, T

### November, 2005

Joe Marguiles (P), St. Paul, MN., *Yang v. City of St. Paul,* 03-5306 (PAM/RLE), D

### January, 2006

Terrence Roberts (P), Riverdale, MD., *Prince Jones v. Prince George's County,* CAL 01-03974, T
Robert Bennett (P), Minneapolis, *Ngo v. Minneapolis Police Department,* 03-3376 (RHK/AJB), D

### February, 2006

Kathy Levy (D), Albuquerque, *Boyer v. Albuquerque*, CIV 03-997 JB/WDS, T
Michael Haddad (P), Oakland, CA., *Wilkins v. City of Oakland,* C01-1402MMC, D

### March, 2006

Christina Norris (P), Louisville, *Hughes v. Louisville Police*, 3:02CV-60-S, D

Thomas Beko/Mary Margaret Madden (D), Reno/Carson City, *Brown v. Edding*, CV-04-0109-LRH-VPC, T

**April, 2006**

Jerry Marconi (P), Chicago, *Saponaro v. City of Bellwood,* 98 L 4985, T

**May, 2006**

Mary Baker (D), Houston, *James v. Harris County Sheriff's Department,* 04TRL0131, D