**Page 1**

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

                   C.A. No. 04-30054-MAP


DEBORAH ST. PETER and     )
MATTHEW BOGACZ            )
         Plaintiffs       )
v.                        )
                          )
TOWN OF AGAWAM, ET AL     )
         Defendants       )
```

          DEPOSITION OF: LOU REITER taken

before Jessica R. Stasio, Notary Public-Stenographer,

pursuant to Rule 30 of the Massachusetts Rules of

Civil Procedure, at the law offices of ROBINSON

DONOVAN, 1500 Main Street, Springfield,

Massachusetts on August 21, 2006.


Appearances: (see page 2)


            Jessica R. Stasio
       Registered Professional Reporter

**Page 2**

APPEARANCES

FOR THE PLAINTIFFS:
COOLEY SHRAIR
1380 Main Street
Springfield, MA 01103
413-781-0750
  BY: DAWN D. McDONALD, ESQ.

FOR THE DEFENDANTS:
ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, MA 01115
413-732-2301
  BY: JEFFREY L. McCORMICK, ESQ.

IN ATTENDANCE: Matt Kelley

**Page 3**

INDEX

WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
LOU REITER     4

**Page 4**

1    LOU REITER, Deponent, having first been
2  duly sworn, deposes and states as follows:
3
4  DIRECT EXAMINATION BY MR. McCORMICK:
5    Q. Mr. Reiter, again, we met already. My
6  name's Jeff McCormick. And certainly from looking
7  at your resume and your report, I can see you have
8  been through this before, and I am not going to give
9  you a long spiel about how to respond in
10 depositions. Just briefly I'd ask that you respond
11 verbally to my questions.
12   A. Yes.
13   Q. And if you'd let me finish my question, I
14 think in our daily lives, I think we naturally think
15 we know what someone's going to say, and we start to
16 answer before they are done. So if you just wait
17 until I am done, I'll be glad to let you say
18 anything you'd like as well, okay?
19   A. I'll do that.
20   Q. Would you state your name, please?
21   A. Lou, L-O-U, Reiter. R-E-I-T-E-R.
22   Q. And you go by Lou?
23   A. I do.
24   Q. Okay. And where do you live, Mr. Reiter?

**Page 21**

1  mailing list.
2  A. If you just call the Public Agency
3  Training Council, they are the ones that printed it
4  and distributed it.
5  Q. Now, you make reference IN your
6  preliminary report to the various materials that you
7  reviewed regarding this case. It's on paragraph 6
8  on page 3. Is that a copy you have in front of you?
9  A. Yes.
10  Q. Okay. And the second and third bullets
11  are Agawam Police Manual in effect as of March 24,
12  2002, and then Agawam Police Manual being updated
13  thereafter. Do you see those?
14  A. Yes.
15  Q. I take it that in the -- certainly in your
16  involvement in the profession and now as an
17  independent contractor or consultant, if you will,
18  you have certainly reviewed, I take it, many manuals
19  of this nature before, haven't you?
20  A. Yes.
21  Q. All right. In your opinion, based upon
22  your education and experience, how did those Agawam
23  manuals stand up to other manuals around the country
24  of police departments of approximately the same size

**Page 22**

1  or towns of approximately the same size?
2  A. Actually, the one that was in effect when
3  this incident occurred is one that many
4  Massachusetts agencies use. It's the MPI, which was
5  decent at the time. The last update of the MPI,
6  though, was 1985. They were still apparently
7  operating on the 1979 version which was an older
8  one. That's been taken over now by the
9  Massachusetts Chiefs of Police Association, and
10  they've put out another one. I think the original
11  came out, I want to say 2000, because I know I've
12  got it on my computer. It's in a disk format, and
13  it's acceptable. But there are still, in the use of
14  force area, there's still one provision where they
15  are not consistent with the model policies that
16  you'll find throughout the United States and
17  recommended by the U.S. Department of Justice. But
18  certainly -- and that's mainly on the reporting
19  aspect.
20  Q. And by that do you mean the, simply the
21  one that Agawam uses or the one that is available
22  throughout the state or the Commonwealth of
23  Massachusetts?
24  A. No, the one that's available through the

**Page 23**

1  state. In other words, they still only have a
2  requirement that -- they don't have a separate use
3  of force report. So they don't have a convenient
4  way of accumulating the data so that it could be
5  evaluated in a reasonable manner. The 2000 version
6  of the Mass. Chiefs model policy indicates that the
7  chief annually should evaluate all uses of force and
8  produce a report outlining his or her evaluation.
9  But if you simply, like Agawam, allow the officers
10  to include uses of force inserted in the arrest or
11  incident report, it's going to be a monumental task
12  at the end of the year to ever pull that out and to
13  be able to use it in any reasonable manner for
14  evaluation and critique, because different officers
15  use different terminology. They could use different
16  terminology on the levels of resistance, on the
17  levels of reaction by the department, on the
18  different tools and techniques that are used.
19  Q. So what you are saying is that as far as
20  you know now and back at the time of the incident in
21  this case, there was at least some form of reporting
22  in the Agawam Police Department, it's just that it
23  wasn't of the nature that you would have preferred?
24  A. Not only -- it's not just me. It's --

**Page 24**

1  Q. Well, I'm asking you.
2  A. It's the Department of Justice, the ICP
3  model policy and the general -- generally accepted
4  practices in law enforcement ever since really the
5  late '80s, early '90s, have had specifically
6  designed use of force, control of resistant persons
7  kinds of reports that will gather statistical data
8  separate and apart from the narrative arrest,
9  offense, or incident report. They don't have that,
10  and there's no indication that the Mass. Chiefs
11  Association even requires it today.
12  Q. Well, that was going to be my next
13  question, in a way. As far as you know even today,
14  does the Mass. Chiefs Association, I believe, or MPI
15  or any entity or institution within the law
16  enforcement business in the Commonwealth of
17  Massachusetts, do any of those have forms that it's
18  promulgated or issued with regard to such reporting?
19  A. I know different departments do, but none
20  of those statewide organizations have a specific
21  form or even require that kind of form.
22  Q. Okay. Thank you. I believe in a couple
23  of locations in your preliminary report, and
24  specifically on page 7 in paragraph 11, if you could

Page 25

1 turn there, please, you say "I am aware that there
2 are distinctly divergent versions of the events of
3 this incident involving use of force, restraint, and
4 arrest of both plaintiffs. I am not making any
5 credibility determinations, and I believe that it
6 would not be appropriate for someone like myself to
7 do so without firsthand knowledge of the incident or
8 personal contact with the parties". Did I read that
9 correctly?
10    A. Yes.
11    Q. All right. So what you are saying is that
12 for the sake of the preparation of this preliminary
13 report, you have taken the versions that have been
14 given in their depositions by the two plaintiffs,
15 Ms. St. Peter and Mr. Bogacz, as opposed to
16 accepting in whole the versions of the police
17 officers that were allegedly involved; is that
18 right?
19    A. Well, that is not totally true.
20    Q. Well, what is not true about that?
21    A. Well, we have a disinterested witness who
22 I've also identified, and then there is also a
23 paragraph where I say that the officers' version is
24 distinctly different. Let me -- paragraph 23. "The

Page 26

1 officers have a totally different version of the
2 events and deny using the types of force described
3 by the plaintiffs". So my position is if you accept
4 the officers' version as they've testified to and as
5 they've written, the force used would be reasonable
6 and consistent with generally accepted police
7 practice.
8    Q. Right. So what it comes down to in this
9 case is that it's a question of credibility with
10 regard to what excessive force or not was used to be
11 determined by a jury or the finder of fact?
12    A. Yes and no. And I -- if I can just --
13    Q. Go ahead. Sure. Go ahead.
14    A. It is, it's a credibility. I mean you
15 have got two versions for what occurred there, and
16 that's the role for the court and the jury to make a
17 determination on. All I can do here is be an --
18 assist to say that this is how force is used, this
19 would be reasonable, this is a consistent -- if you
20 have this level of resistance, this is the kind of
21 force that officers are trained to use, this would
22 be not consistent with that. And I think there was
23 recently an, in fact, a first circuit -- no, it was
24 a district court decision up in Maine which is that

Page 27

1 is specifically what they said, you know, I couldn't
2 say group A was right and group B wasn't, but that I
3 could provide the court with expert assistance in
4 describing use of force based on hypotheticals or
5 based on circumstances of an encounter.
6    Q. The witness you were referring to was
7 Mrs. or Ms. Delucchi, --
8    A. Yes.
9    Q. -- wasn't it? You read her entire
10 transcript?
11    A. I did.
12    Q. All right. You'd agree with me, wouldn't
13 you, that Ms. Delucchi said she didn't see the
14 entire incident that occurred, did she?
15    A. That's true. She did not.
16    Q. I believe she, and I'm paraphrasing what
17 she said, but I believe she said words to the effect
18 that she heard a commotion or something going on
19 outside, I think she attempted to look out a window,
20 eventually went upstairs and looked out another
21 window and saw some things going on?
22    A. Right. She didn't see the front end of
23 it; correct.
24    Q. And I believe that the pages that you cite

Page 28

1 in her testimony in paragraph 18 on page 10 of your
2 preliminary report are simply some portions of the
3 statements that she made in response to questions at
4 the depositions?
5    A. Yes.
6    Q. You haven't spoken to Mrs. Delucchi at
7 all?
8    A. No.
9    Q. You make reference, I believe in paragraph
10 16 and possibly some other places, about Mr. Bogacz
11 and Ms. St. Peter having discussion in their
12 testimony about at least Mr. Bogacz being struck in
13 or about the head; is that right?
14    A. Yes.
15    Q. Okay. And were you provided with the
16 photographs that purported to show the cuts or the
17 wounds, if you will, that he received during the
18 melee, if you will?
19    A. Yes.
20    Q. The manner in which you are understanding
21 he received the cuts on or about his head come from
22 the testimony that he gave in his deposition -- it's
23 a crummy question. I'll start that again.
24    You say in your preliminary report that